IiiSiiET, J.
In the year 1862, there was standing on the books ‘bf the Louisiana State Bank, to the credit of the State of Louisiana, the sum of four hundred and sixty-two thousand seven hundred and fifty-two dollars and thirteen cents, and. the bank, having then in its vaults, in “Confederate bills,” about a million of dollars, including the State’s balance, applied to Gen. Shepley, Military Governor of Louisiana, for permission thinvest this Confederate fund in cotton, within the Confederate lines of military occupation, in order from the proceeds thereof that the bank might be’ enabled to pay its debts to the State and to its other creditors.
The permission, under the sanction of the Commanding General of the Department of the Gulf, was granted; and under it the bank-succeeded in purchasing, within the Confederate lines, a large quantity of cotton, of which it saved, and brought to New Orleans, seven thousand and fifty-two bales, which after the United States government liad-withdrawn its quota, say fourteen hundred and two hales, and all commissions for purchasing, etc., and all costs and charges had been paid, yielded net, the sum of five hundred and seventy-two thousand three hundred arid sixty one dollars and eighty-three cents, out of which sum held by the bank; the State now seeks to be paid its balance.
William Bailey intervened in the suit, claiming the cotton received by the bank at New Orleans, to be his exclusive property. !
The bank’s defence, which will be specially noticed hereafter, travéfses' the claim set up both by the State and the intervenor, and there is also,’ on the part of the bank, a plea in reconvention against the State.
The State and the intervenor have appealed from a judgm jBL.r(&dered wholly against them by the District Court.
It is indubitable that the traffic in cotton, which the bank the military to engage in, was illicit, being in conflict with of the act of Congress of 13th July, 1861, and the proel President of the United States of the 16th August next f proclamation, deriving its authority from the said act, ha> all the authority of positive law.
The District Court of the United States for the South of Illinois, had occasion in the matter of the, United States cotton, G. A. Lemore & Co., and others, claimants, to in chases of cotton made within the Confederate lines u tion by the bank, and pronounced them illicit and i direct contravention with the United States statute i above referred to.
This ruling of the United States Court meets ou presumption of power in the Commanding Gener mercial intercourse between the inhabitants of districts can arise, when its exercise conflicts, law.
But does this illegality of the bank’s contracts f ton within the Confederate lines, preclude, the co the State’s claim, to be paid its balance, unde agreement entered into between the bank and <
We think not, for,' as was well said by the Supr States in Brook v. Martin, 2d Wallace, page *470 which were illegal, have become accomplished facts, and they cannot be affected by any action of the Court in this case.”
“There is,” said the Court, “a great difference between enforcing illegal contracts and asserting title to money which has arisen from them,” a difference distinctly made in Tenant v. Elliot, 1 B. and P., 3; Farmer v. Russell, id. 69, recognized and approved by Sir William Grant, in Thomson v. Thomson, 7 Vesey, 473, all of which cases were reviewed in McBlair v. Gibbes, 17 How. 232.
It may be asserted as a point conceded, which the bank does not gainsay, that if anything is due by the bank to- the State, it is recoverable in lawful money; but the bank set up a defence against the State, which would seem, upon its bare statement, to involve the State in a dilemma; which is, that the State’s claim really represents the unpaid balance of the price of certain State bonds which the bank was compelled to take, amounting-to one million of dollars, and which the bank still holds, a fact admitted by the State, for in the brief filed in this court in its behalf, it says: “On the 23d October, 1862, the State of Louisiana stood with a credit-of $482,752 13, on the books of the Louisiana State Bank, proceeding from 1 the undrawn balance of the sale of the bonds, issued by the State and purchased by the bank.”
Now, the bank’s position is this: These bonds are either legal and valid; or they are illegal and void ab initio; and the relation between the State and the bank is either that of creditor and debtor, or of buyer and-seller.
If th$ bonds are valid, the bank holds enough of them past due to compej¡^|[^he State’s balance, and to justify a judgment in reconvenyor against the State; if the contrary, the State cannot by court an action to recover any portion of their price, wever, strenuously objects to the connecting, in any man-' for which it claims entire immunity, with the bonds k, which it repudiates, and in this connection it argues: ither by the act of the State in convention or otherwise,: lovernment in the exercise of the war-power which it over the States whilst engaged in the rebellion, have ,nd an object of abhorrence; if they are to be looked pnihilated, they can be invoked as a title by the bank ;ossible connection with the contract under which tho li transformed and actually novated the character of the bank. This contract, says the State, is made in ansaction, which does away with anything that does ‘^visions bodily and substantially; and if the bonds ihe nonentity, and the repudiation denounced against ey can be pressed upon the State by the only means ptional custom, by proper application to its constinot in the indirect way in which their redemption
proposition, it may be observed, that when the f its courts to enforce its claims against its citiemselves of every legal defence against the State [other suitor.
*471 The State seems impressed with the idea, that Gov. Shepley was actu-/ ated by one sole motive, in permitting the bank to invest its Confederate, bills beyond the United States military line; and that was, that the State in any event, should be paid its balance in good money, It loses/ight of the fact that considerations of public policy entered deeply into the reasons for the acquiescence of the military with the bank’s request.
“It was,” as Gen. Shepley says in his depositions, “to throw thereby into the circulation of the rebel States a million of dollars of Confederate notes, then locked up within our lines, and thus tend to that extent- to depreciate their currency; besides, if the cotton bought with Confederate., money should be brought within our lines, many millions would ,be drawn from their revenues and added to those of the loyal States, without returning anything of value, and only that which would weaken them.”
The Military Governor was no doubt solicitous, that the large balance-apparently due by the bank to the State, should be paid in lawful, money; it could hardly have been supposed or intended, even by him, and much less by the bank, that when the claim of the State was asserted, it-was to be paid absolutely, and in any contingency, regardless of what ,- might be at the time the actual state of account between the State and, the bank.
That the bank should be precluded from showing that it really then owed nothing to the State; that the claim set up by the State was never due, or that if once due, it had been extinguished, and that the State,. once its creditor, had become its debtor.
We can find nothing in the understanding, which the State clings to, so, tenaciously, to sustain a position so unreasonable, so inequitable as that.
All that was expected from the bank was that, out óf the proceeds of the cotton, it should pay the debts it lawfully owed, which debts underwent no transmutation or novation by the agreement, but retained their original character; whatever that was, as regarded the obligations, the investment of the Confederate money being merely a means afforded the bank to discharge them. ,
The bank’s defence against the State involves, as between them, the whole matter in controversy, “the balance” and “thebonds,” and as' that defence is twofold, and in the alternative, it becomes, therefore,, necessary that the true character of the bonds should be ascertained and . determined.
The Judge of the lower court made a discrimination between, the treasury notes and the bonds, both issued by the State under the provi- - sions of an act of the Legislature of the State of Louisiana, approved,. 23d January, 1862, entitled “an act to raise money for the State treas-. ury,” deeming the former emphatically a military fund, expressly designed for military purposes, and the latter a fund to defray the lawful expenses of the government.
The Judge attached some importance to the fact, that the Commanding General, exercising complete control over the whole assets of the bank, only seized and confiscated out of the State obligations, consisting of the two classes above named, the treasury notes, leaving thebonds in possession of the bank; and from that circumstanoe, and his reading of *472 the act of the 23d January, 1862, he came to the conclusion that the treasury notes were'null, but that the bonds were valid.
The treasonable character of the treasury notes, impressed upon their facé> not discernable upon that of the bonds, was the cause of thedistinctionNnade by the military between them, and caused the seizure and confiscation of the former only.
A careful perusal, however, of the statutte which authorizes the issue of both notes and bonds, has satisfied us that there is no material difference between1 the one and the other.
The great end and object of both notes and bonds, was to furnish aid in carrying on the rebellion against the United States.
The act of 1862, if interpreted solely by its enacting clauses, would sufficiently indicate what was the design and object of the Legislature in passing it, but calling in aid the preamble of the act, which, for the purpose of interpretation, but not to control the enacting clauses, is deemed a part thereof, (see Montesquien v. Hale, 4 La., page ) it becomes evident that the proceeds of both treasury notes and bonds were to be used indifferently in the prosecution of the rebellion.
' That this object was uppermost in the Legislative mind, is palpably clear from the tenor of the preamble, which is as follows:
“Whereas, the State of Louisiana has expended large sums of money, drawn from the treasury for military purposes, and contemplate further expenses thereof; and whereas, the State has assumed towards the Confederate Government the payment of the Confederate war-tax, the levy of which has been authorized by an act of the Provisional Congress, approved the nineteenth day of August, eighteen hundred and sixty-one; and whereas, during the existing state of affairs, the collection of taxes cannot, with sufficient certainty, be relied upon to meet the accumulated wants of the treasury; therefore, it is resolved, that “the Governor of the State shall borrow in behalf of the State, from time to time, as the 'wants of the treasury may require, a sum not exceeding seven millions of dollars, either by the issue of bonds or treasury notes of the State, or of both, provided that the treasury notes shall not exceed in amount two millions of dollars. ”
: The proceeds of the bonds are to be deposited in the treasury of the State to the credit of the general funds, and the treasury note shall be deposited with the State treasurer, who shall receipt therefor to the auditor, and the amount so deposited shall be credited to the military fund, whieh is hereby created, and which shall be used exclusively for military purposes, and to pay the debts contracted by the Governor for military purposes.”
There is nothing in the act to designate the particular use to which the bonds or their proceeds were to be put; but in order to ascertain whether at least a portion of them was not intended to advance the cause of the rebellion, it is well to refer to the 8th section of the act, which is significant.
" It provides, “that for the payment of the current interest that may accrue upon the bonds to be issued under this act, and of the principal of the bonds, as the same mature, it shall be the duty of the auditor of pub- *473 lie accounts, within thirty days after he. shall have, received -the assessment rolls from the several parishes and municipal corporations:
1. To determine the rate of taxation, etc.
2. To notify the -several sheriffs and tax collectors of the rate of taxation, as ascertained and fixed by the said auditor for the payment of.said •current interest and principal (of the bonds) said rale of tqxjition.shall he designated and known as the war-tax, and said war-tax -as. annually .ascertained and fixed, is hereby levied, etc., and it shall be the duty .of the said sheriffs and tax collectors to collect the said war-tax, and the collection of the same shall be enforced as the law provides for the.collection of other taxes.”
If the bonds or their proceeds were intended solely .to defray the ordinary expenses of the government, why should the taxes to be-leviedrto meet them be designated and known as a war-tax in contradistinction to other taxes? ,.
“ Grim-visaged-war ”-pervades. the statute from one end. .of it.tq.the other: and the only difference between the-treasury notes and the bonds is, that the first were to be used exclusively for war purposes, and'the last-to aid the rebellion, and for other purposes besides. But in .the eye of the law, the notes and the bonds are equally tainted with the dye of treason; and no court of justice would undertake the task of deciding which particular bond, or what portion of the proceeds thereof, were ,to !be used for lawful, and what-for illegal purposes. It suffices to stamp the whole issue of State bonds, under the act of 23d January, 1862, with -the-seal of reprobation, that they were to be used, if at all, in attempting to overturn and disrupt the general government.
These bonds, being the basis of the State’s claim against.tbe hank, no action lies for the recovery thereof,-and the plaintiff’s action, as well as the defendants’ plea in reconvention, must be therefore dismissed.,-
We liave now come to the second branch of the case, which is the intervention of William Bailey, who sets up exclusive:title as owner to all the cotton in the bank’s possession.
In order to establish his ownership of the cotton, beyond-the presumption of the law, resulting from its possession of it, the bank produced in court several witnesses, the principal one being its agent, employed to invest its Confederate money in cotton purchases, as before stated.
This witness was objected to by the intervenor, on the score of interest and the resolution and -release granted him by the bank to render him competent to testify in the suit, -were also objected to.
As we deem the release sufficient to discharge Stevenson from all liability to tbe bank, it is -unnecessary to examine into the question of interest.
Two objections are urged against tbe release; first, that the resolution upon which it was based-was void, because the meeting of the board-of directors which authorized the president of the bank to grant the release, was only composed of five instead of nine directors, .as required by,the charter, it being, however, conceded in argument, that -by-subsequent legislation a less number-than nine might act in the premises, .provided the amendment to the charter bad-been duly accepted, which it.devolved *474 on the bank to prove. This preliminary evidence, on the part of the bank, was unnecessary.
It was held in Dundridge v. The Bank of the United States, 12 Wheaton, 64, that the maxim omnia prcesumuntur rite et solemniter essa acia, was deemed applicable to corporations, and in that case, the principle was clearly enounced, “ that acts done by a corporation, which presuppose the existence of other acts to make them legally operative, are presumed proofs of the latter.” So, in relation to the question of acceptance of a particular charter by an existing corporation, or by a corporation already in the exercise of corporate functions, the acts of the corporate officers are admissible evidence from which the facts of acceptance may be inferred. See also the case of Palfry v. Paulding, 7 A. 364.
On this ground, therefore, the objection was overruled.
The resolution to release Stevenson was passed expressly to enable him to testify in the suit between the bank and the intervenor.
There is a verbal inaccuracy in the first resolution, which is beyond criticism, as it explains itself.
By it the president of the bank is authorized and empowered to execute to the said John A. Stevenson a full release and acquittance of all liability to the bank for any cotton, money or claim belonging to the bank, which shall or may be adjudged to, or to be paid to the said William Bailey. The word “belonging” should have been written claimed by, as these things could not belong to the bank and to Bailey at the same time.
' The release is sufficiently explicit and binding to protect Stevenson from any liability whatever to the bank, on account of his agency or otherwise; or from any obligation to return to the bank any part of the compensation or commission for services rendered in cotton transactions for the bank, and the release conforms sufficiently to the resolution.
Both the resolution and the release are admissible testimony, and Stevenson is a competent witness to testify in the case.
In order to substantiate beyond the legal presumption of the bank’s ownership of the cotton, brought by it to New Orleans on the Doubloon, Louis D’or, Beauregard and Texas, it adduced,other proofs for the purpose of showing when, how and where the cargoes of these boats had been acquired and shipped.
The most important of the bank’s witnesses for this purpose, was its special agent in all its cotton transactions, Stevenson and his evidence, in some particulars, is sustained by that of other witnesses, who were engaged with him in purchasing cotton, storing it at different points, and transmitting it to New Orleans on these boats.
It seems that a large portion of the cotton purchased for the bank was not bought by Stevenson himself, but by sub-agents, and purchases were made at different times, and scattered through a large extent of country in three States, Louisiana, Texas and Arkansas, it would be difficult therefore for Steyenson to speak with great accuracy, as to the loading of the four boats mentioned with the bank’s cotton, and identifying it with that purchased by or for him in 1863; that the bank nevertheless made out a strong prima facie’ Case, and it devolved upon the *475 intervenor to rebut the bank’s evidence, and to prove conclusively tlmt the cotton claimed by liim was really his property.
This he undertook to do, and produced for that purpose a great many' witnesses.
He shows, that whilst the Federal army was at Alexandria, on Red’ River, he had collected together in that town some five or six thousand' bales of cotton.
That this cotton, bearing the mark “A. Q. M,” with “W.B.” on end, or" a large portion of it had been shipped on board United States trans-' ports, lying off the town in the river, and bound for New Orleans; but that the Federal army, having met with reverses, all the cotton was thrown ashore, in order that the transports might be used’fór other purposes.
He proves that a part of this cottoii was afterwards seen in Shreveport and at New Orleans, on board of the steamboats Doubloon, Texas, Louis, D’or and Beauregard.
The witnesses, who testify on this point, identify a portion of the cotton, seen by them, as before stated, at Shreveport and at New Orleans, when these boats brought the cotton hither, as the same cotton they had seen as the properly of Bailey, at Alexandria.
To rebut this testimony, the bank adduced proof to show that Bailey, the intervenor, never had more than a few hundred bales in Alexandria, and produced a contract between Bailey and one Simpson, an Englishman, entered into about the time of the evacuation of the town by the Federal army, with the view of saving his cotton from the Confederate army, of all he had in Alexandria, and which only amounted, to five hundred bales. Further, that upon the evacuation of Alexandria, the town was wrapt in flames, and that all the cotton therein was destroyed.
That some bales of Bailey’s cotton were got out of the town, and sent up the river, but that was accounted for, as it was all sent into the interior of the country.
Bailey explains all this. He shows that the sale to Simpson was made whilst the bulk of his cotton w»as on the transports, several days before the evacuation of Alexandria, and was thought to be safe, and that the five hundred bales mentioned in the sale was what remained in the town for want of means of transportation; and it was. in tended to protect that from seizure by the Confederates.
As to the conflagration, Bailey accounts for his cotton not being burnt, by the fact that it whs thrown ashore hurriedly from the transports all along in front of the town, under the bank of the river, and. that as the wind was at the time blowing across the river towards the town, and the fire being above the bank, his cotton was thereby protected and saved.
The intervenor, Bailey, proves by several witnesses, that some six hundred bales of his cotton, which they identify by his marks on the bales, partially erased, although not totally effaced, with the same kind of bagging, and having the same appearance of his bales, seen by them at Alexandria, were identified in the four boats, both at Shreveport and Sew Orleans.
In a controversy like this one, that there will be a vast deal of conlicting testimony, is to be expected.
*476 We have examined the whole of it, whether adduced by the bank or the intervenor, and on drawing oar conclusion in weighing it, we are unable from the record to perceive why the witnesses on both sides are not erititled to an equal degree of credit.
Bailey claims three thousand bales of the cotton in controversy, but he has only identified as his property six hundred bales thereof, on the four boats named.
It is not shown where this cotton was put on board these boats, nor how it was up the fiver from Alexandria, but this is immaterial, if it is proved, as we hold it to be, that the cotton was identified as Bailey’s at Shreveport and New Orleans.
The Judge of the lower court displayed great learning and research'in his attempt to show that the Confederate Government was one de facto; ahd‘ that if any cotton of Bailey’s was captured by it at Alexandria, upon the surrender of the Confederate army in Shreveport,' the cotton by capture became the property of the United States.
There is nothing to show that any of Bailey’s cotton was ever confiscated by the Confederates or by the United States; and in such a ease, the rule laid down by Wheaton, in his Elements of International La'w, page 42, ed. 1855, applies:
He says: , “ If, on the other hand, the revolution in the government of the State is followed by a restoration of the ancient order of things; both public and! private property, not actually confiscated, revert to the original proprietor on the restoration of the original government, as in tho case of conquest, they revert to the former owner on the evacuation- of the territory occupied by the public enemy.”
“Private property, temporarily sequestered, returns to thé former owner, as in the case of such, property recaptured from an enemy in war, on the principle of jus posUiminii. ”
Eyorn the six hundred bales of cotton, which are awarded to Bailey, must be deducted the government quota, say one-fifth or one hundred and forty.bales, leaving to him four hundred and sixty bales; the weight of each bale proved to be five hundred pounds.
Taking the average of the qualities of the cotton from the tables of classification, and the average of prices for the different grades of quality from the current prices in proof, we find the mean priqe of the interven- or’s cotton to be thirty cents and eight mills per pound, equal to one hundred and fifty-four dollars per bale, equal to seventy thousand eight hundred and forty dollars, and for this sum judgment will be rendered for the intervenor. ,
,, ,It. is therefore ordered, adjudged and decreed that the judgment of the District Court be annulled, avoided and reversed.
It is further ordered, that the demand of the State of Louisiana, against the Louisiana State Bank and the demand in reconvention of the Louisiana State Bank against the State of Louisiana, be-dismissed.
It is further ordered, adjudged and decreed that judgment be and the same is hereby rendered in favor of William Bailey, the intervenor, and against the Louisiana State Bank for the sum of seventy thousand eight hundred and forty dollars; and, it is further ordered, that the bank pay the costs of intervention in both courts.
*477 Hvhan, C. J.
For the same reason that caused us to decide in the ease of White v. McKee, 19 A. p. 111, that there was no Legislature in Louisiana in 1863, I conclude that there was no Legislature of the State in 1862, without a Legislature in 1862, there could not have been an a,ct-passed by the Legislature in that year. ,.
A supposed act of the Legislature of that year is referred to in the decision now rendered, and the decision is against the claim of the; State, - because the so-called act has provisions for supporting the rebellion.
The decision against the State is correct, not for the reason given by the majority of the Court, but because no such act was passed by a Leg-, islature, and because no contract or arrangement could have been-, made by authority of a spurious act of 1862, between the State and the bank to bind either.
I do not differ from the majority of the Court, in their reasons for deciding on the claim of the intervenor.
I concur in the decree of the Court.