No. 2473.—R. S. Sandidge *v.* J. S. Sanderson, and J. S. Sanderson *v.* R. S. Sandidge.     (Cumulated.)

Where a contract of sale of land, slaves and personal property was made for part cash and part credit, for which promissory notes were executed by the purchaser, due at different periods of time before emancipation, and a portion of the notes for the credit price have been paid, the purchaser of the property for which the notes were executed, is only bound to pay that portion of the outstanding notes after emancipation which is found to be due on the land and personal property, in the proportion of the value of the land, slaves and personal property in the original contract of sale.

The holder of a mixed obligation, the consideration of which is part land and part slaves, can not recover that portion for which slaves formed the consideration. Constitution, art. 128.

APPEAL from the Tenth Judicial District Court for the parish of Bossier. *Weems,* J. *Nutt & Leonard,* for plaintiff and appellee. *S. T. & A. D. Land, Griffin & Snyder,* for defendant and appellant.

WYLY, J. In 1858 Sandidge sold to Sanderson a certain tract of land, personal property and slaves for the price of $18,000, estimating the land and movables at $9000, and the value of the slaves also at $9000. The purchaser paid $6000 cash, and gave his four several promissory notes for $3000 each, bearing interest, in evidence of the balance of the price, securing the payment thereof by special mortgage on the land and slaves.

All of said notes were subsequently paid to the vendor, except the last one, which became due on first May, 1862. This last installment is the subject of the present litigation. Upon it Sandidge sued out an order of seizure and sale; and Sanderson enjoined it upon various grounds. The most serious one is the alleged failure of consideration by reason of emancipation. Plaintiff in injunction contends that he has already paid far more than the value of the land and personal property which was only estimated at $9000. That, having already paid $15,000, if he is compelled to pay the last installment of $3000, or any part thereof, he will be compelled by the court to discharge an obligation for the sale of persons, in contravention of article 128 of the Constitution of this State.

The subsequent transactions, partnerships and amicable partition by notarial act between the parties to this litigation did not embrace the

note involved in this suit and did not discharge the obligation. We therefore deem it unnecessary to enter upon the discussion of matters which, from the evidence, appear to be irrelevant to the main issue presented in this case.

At the time of the proclamation of emancipation there existed a legal obligation evidenced by the note for $3000, upon which this suit is founded. It was for the balance due by Sanderson to Sandidge for the purchase of land, personal property and slaves. It was the deferred payment, one of the installments evidenced by note given at the time of the sale in 1858. If that note had been for slaves pure and simple, there would be no question that the obligation would be considered discharged, or at least could not be enforced by reason of emancipation and article 128 of the State Constitution. But what is the character or consideration of that obligation, regarding it as one of the installments, deferred payments, of the whole debt?

The debt was half for slaves, half for land and movables. There were four notes issued. Can we say any one of the notes was specially intended to represent the debt for the slaves? Did the parties designate that certain notes were for slaves and certain others for lands? If so, the question might stand on a different basis.

The consideration of the debt was mixed. It was divided into convenient installments without designating the consideration of either of the notes. Can we now say that the three notes paid before emancipation were for the land and personal property, and that the remaining one, now in suit, was purely in evidence of the slave part of the debt?

In other words, shall we now make for the parties an imputation of the payments made before the rebellion, when it is perfectly evident that no special imputation nor any imputation whatever was intended by the parties? The payments made prior to emancipation were simply in discharge of the whole debt *pro tanto*. The original obligation had been so far discharged that Sanderson only owed Sandidge a debt of $3000 for land, movables and slaves, the value of the slaves making up half the debt. The relation of the parties was just the same as if Sanderson owned all the property except one undivided share for which he owed Sandidge the $3000. The doctrine of imputation has no bearing on the case. It must be made by the parties or by the law in force at the time of payment. It was not made by the parties, and the law in force at the time recognized the validity of a slave consideration.

Under the then existing law, the slave was as valid an object of a contract as any other. The purchaser, when he paid the $6000 and made the notes, and afterward paid them all but the one in suit, did so in discharge of his obligation for the slaves as well as the land. He had contracted an obligation for them both; and he undoubtedly

intended to make the payment and did make the payment as a *pro tanto* discharge of the whole debt.

In the midst of a great rebellion, jeopardizing the life of the nation, the sovereignty of the United States demanded emancipation. The slave was taken for a soldier to fight its battles and maintain its paramount authority. A great public emergency thus destroyed slavery, the object, in whole or in part, of numerous unexecuted contracts in this State. In organizing government under the reconstruction acts, the sovereign power of this State took into consideration the equity existing between debtor and creditor in the slave contracts remaining unexecuted, and it imbedded in fundamental law a perpetual inhibition against the enforcements of contracts of that character by the courts of this State.

Whether emancipation by the paramount authority of the United States discharged the obligations for slaves or not, the remedy or power to enforce them has been withheld from the courts of this State.

We do not think the plea of failure of consideration by eviction or the doctrine of warranty has any application to this case. Eviction by emancipation is not such failure of consideration as the vendor was bound to warrant against. In the contract of sale the clause "warranted slaves for life" meant that they were such by the laws in force at the time and not *statu liberi*. It would be beyond the power of the vendor to warrant against superior force or the acts of the sovereign.

In our opinion the doctrine of immorality is also inapplicable. The validity of the contract must be measured by the law in force at the time of its inception. Slaves were lawful objects of contracts in 1858, when the one under consideration was made, and we can not, with propriety, now say that that which was at the time lawful has tainted the contract with immorality. The morality of a contract, as well as its legality, must be tested by the laws in force at the time it was made. If the contract was then moral it could not be rendered immoral by subsequent laws. Laws provide only for the future. They govern and regulate contracts made after their enactment. Payments made prior to the rebellion, if there be legal imputation, must be imputed by the laws in force at the time. Their imputation can not be regulated by posterior laws. Our laws, now prohibiting the sale of persons, and making it immoral, can not apply as tests of morality to contracts of the past, nor can they regulate the imputation of payments made prior to the rebellion. The title to the slaves was then no more precarious than that to the land. The slave part of the consideration was then no more immoral than the other part of the consideration. The slave part of the debt was as binding and obligatory as the part for the land and movables. Hence the law at the time made no imputation whatever.

We deem it useless to discuss the question whether emancipation

discharged obligations for slaves or not. Article 128 of the Constitution prohibits the courts of this State from enforcing them.

The main question for consideration is, how shall we apply the prohibitory clause of the Constitution to contracts of the character presented in this case, where the consideration was mixed, part slaves and part land and movables?

Shall we refuse to enforce the whole debt, or shall we only refuse to enforce the slave part of the debt? The prohibitory clause of the Constitution should be construed strictly. We can only refuse to enforce the slave part of the debt. The debt was originally half for slaves and half for other property. The payments prior to the rebellion can not fairly be imputed to that part of the debt for land and movables. We can not presume the parties intended to apply payments to the amount of $15,000 to that part of the debt which was only $9000. The payments were obviously made in discharge of the whole debt *pro tanto*. The remaining note on which this suit is based therefore evidences a debt the consideration of which was half slaves and half land and movables. We are of opinion that the plaintiff, Sandidge, should have judgment against the defendant, Sanderson, for half the amount of his demand, and that his mortgage should be recognized and rendered executory.

It is therefore ordered that the judgment of the court below, decreeing to plaintiff the full amount of his demand, be avoided and reversed; and it is now ordered that the plaintiff, Richard S. Sandidge, recover judgment against the defendant, James S. Sanderson, in the sum of fifteen hundred dollars with eight per cent. per annum interest thereon from the sixteenth January, 1858, subject to a credit of one hundred dollars, paid on second March, 1863. It is further ordered that the mortgage herein be recognized and rendered executory on the following described lands to wit: The northeast and southwest quarters of the northeast quarter of section No. 2 in township No. 18, north of range No. 13 west, containing eighty-four and thirty-four one hundredth acres; the southeast quarter of section No. 2, same township and range, containing forty-one and sixty-seven one hundredth acres; the southeast quarter of the southeast quarter of section 35, in township 19, range 13, containing forty acres, and the southwest quarter of section 36, township 19, range 13, containing 160 acres, with all the buildings and improvements thereon. All of said lands being situated in the parish of Bossier and State of Louisiana. That said lands be sold to satisfy the judgment herein and costs hereof. It is further ordered that the plaintiff pay the costs of this appeal.

*Justice Taliaferro, concurring :*

I concur in the main, in the opinion of the majority of the court.

In resisting the plaintiff's demand, the defendant avers that the con-

sideration of the notes sued on, being in part for the price of slaves, and to that extent reprobated by law, as being against good morals and public policy, the entire contract is vitiated and consequently null and void. He moreover contends that the payments he has heretofore made under the contract, can only be applied to the value of the land which has thus been paid for, and that there remains nothing due the plaintiff. That as the law repudiates that part of the consideration which relates to the slaves, it will not impute the payments to the price of both land and slaves.

The principles and spirit of the decision in the case of Wainwright *v.* Bridges, 19 An. p. 234, is invoked to sustain the main ground of the defense, and various authorities are cited to show that if any part of the entire consideration of a contract is illegal and against sound morals or public policy, the whole is null.

This doctrine that the nullity arising from the illegality of a part of the consideration of a contract operates the nullity of the whole, is, I imagine, in the general well settled.

"If any part of the *entire* consideration for a promise, or any part of an *entire* promise not in its nature capable of separation, be illegal either by common law or by statute, the whole agreement is void." Chitty on Contracts, page 692.

" A distinction has been taken in the books between a deed or condition void in part by the statute, and the case of such an instrument being in part void at common law.      *      *      *      *      *
*      *      *          But this distinction cannot be supported; and a contract is void *in toto* if a part of it is illegal either by virtue of a statute or at common law." Chitty on Contracts, page 693.

" There are, however, instances in which the invalidity of a part of a deed, even by virtue of a statute, has been held not to destroy the whole; and the remainder, being legal and distinct, and capable of separation from the illegal provision, has been allowed to stand, there being no express words in the act to render the whole void." *Ibidem,* page 693.

"If any part of the entire consideration of a contract is illegal, as against sound morals or public policy, the whole is void." 6 Dana's Reports, page 91.

" Where the consideration of an agreement is in violation of a statute, no action can be maintained upon it by either party." 17 Massachusetts Reports, page 258.

" An action cannot be sustained in the courts of a State on an agreement entered into in violation of the laws of the United States or of the laws of the particular State." 4 Dallas, page 298.

This general doctrine is recognized in Parsons on Contracts, vol. 1, page 455 *et sequentes,* vol. 2, page 673; 2 Pothier on Obligations, page 16; 9 Iowa Reports, page 384.

Where, however, the illegal part of the consideration is ascertainable with sufficient certainty, and may be separated from the illegal part, there seems to be no sound reason why the contract should not be enforced to the extent to which the consideration is legal.   This principle has often been acted upon.

In the case of Greenwood v. Curtis, 6 Mass. Reports, page 358, a contract was entered into on the coast of Africa by which one of the parties, in cons deration of a cargo of merchandise received, obligated himself to deliver to the other party one hundred and fifteen slaves. A part only of the slaves were delivered.   Upon an account stated, the party in default deducted the estimated value of the slaves delivered, and of certain supplies furnished by him, and acknowledged a balance due in cash.   He afterwards gave his note for this balance stated in his account, to be paid in slaves.   Being sued subsequently on the account, the court held that the action upon the *insimul computassent* might be maintained, and gave the plaintiff judgment accordingly.

But the rule which vitiates the entire contract, on account of a partial defect in the consideration, seems, in general, to be restricted to and relate more especially to cases where such partial defect arises from a clause or stipulation in the agreement, which is violative of some law existing at the time the contract was entered into.   This rule, then, would hardly seem to apply to the case now under consideration; for at the time the contract was made by the parties, there was no law of this State prohibiting the buying and selling of slaves. The fact was distinctly recognized by this court, in the case of Wainwright v. Bridges, that, antecedent to the action of the sovereign power abolishing slavery, obligations for the payment of the price of slaves might be and were judicially enforced.   Slavery existed, it is true, in violation of natural right, and contracts having for their object the retention of human beings in the condition of involuntary toil and servitude would, in the forum of an enlightened conscience, be adjudged in derogation of sound morals; yet, such contracts had the sanction of the then existing laws or regulations relating to slavery, and the sovereign power then permitted such laws or regulations by not having pronounced against them.   So, in the later ages of the Roman empire, there were laws sanctioning slavery and enforcing contracts for the sale of slaves, and still the Digest of Justinian, then in force, expressly declared slavery to be in violation of natural right and natural justice.

Seeing, then, that at the time the parties entered into the contract in relation to the land and slaves, forming the object of the contract, the slaves constituted, to the extent of their value, as valid a part of the consideration as the land.   I think the entire contract was not rendered null by reason of the alleged illegality of the sale of the slaves.   Nor do I consider that the entire contract is null from the act of the sovereign power annulling, subsequently to the formation of the contract,

R. S. Sandidge v. J. S. Sanderson, and J. S. Sanderson v. R. S. Sandidge.   (Cumulated.)

its consideration to the extent of the subsisting unpaid part of the price or value of the slaves.

An insuperable barrier is in the way of the plaintiff's recovering the unpaid price of the slaves, either in whole or in part. This point has been definitely settled and put to rest by the decision, before referred to, of Wainwright v. Bridges, and the more authoritative prohibition of article 128 of the State constitution.

I believe it is not out of the power of the parties to ascertain, in cases like the one before us, the portion of the entire consideration to be deducted; at least, that this can be done by an approximation sufficiently near and with sufficient certainty to form the basis of a judgment that will do justice between the parties. With regard to payments made on contracts of this kind before the enforcement of obligations for the price of slaves ceased, equity requires that they should take effect in the manner intended by the parties; that is, as payments on the entire sum stipulated to be paid by the purchaser, as the consideration for which the sale was made. Courts will not deal with the executed parts of these contracts otherwise than the parties themselves have manifestly done. Payments made under the circumstances in view were, beyond all cavil, made *pro tanto* by the debtor for land and slaves, and these payments were received by the creditor in like manner, as far as they went, in satisfaction of the price of land and slaves.

Courts make no imputation of these payments. They accept the disposition which the parties themselves have made of them. Their intention and consent that the payments were made upon the whole price, is patent upon the very face of the act. Even if it were a mere presumption, it would be for the party holding the negative to overcome the presumption, and prove that such was not their purpose. Executory contracts relating to the price of slaves were stricken with nullity by the final action of the sovereign power; but that power went not back upon the dead past, nor authorized the courts to do it; for whatever was paid on such obligations, prior to that final action, there is no reclamation, nor can any other destination be given to such payments than that which the contracting parties themselves have given them. The law in such cases leaves the parties where it found them. It will not hear the absurd plea from one of them that the partial payments made on a contract for land and slaves, were intended to be applied to the price of the land alone. It will give no countenance to the purchaser, who, willing to be relieved from his existing obligations to pay the price of slaves, is yet unwilling to lose what he has paid for them, and desires the seller's land to be given him as an indemnity. Such a litigant is in court with but little grace.

Article 128 of the State constitution declares that "contracts for the

sale of persons are null and void, and shall not be enforced by the courts of this State." A contract originally for both land and slaves, shorn and divested of its legal force as to the recovery of the unpaid part of the price of the slaves, is not a contract for the sale of persons. Obligations originally entered into to pay a stipulated price for land and slaves, have since become utterly and absolutely null, to the full extent to which the estimated value of the slaves formed a part of the consideration. These obligations, then, are no longer obligations for the payment of the price of slaves. I see no violation of the constitution in rejecting that part of the contract which is null, and enforcing the part.that is valid. I think substantial justice between the parties can only be done by ascertaining the value, at the time of the sale, of the land separately, and that of the slaves separately; and, rejecting the latter in the computation, adjust the indebtedness for the land, and where partial.payments have been made before the nullity of a portion of the consideration arose, dispose of them as the parties have applied them, to the aggregate sum fixed for the entire purchase. I see no inordinate difficulty or inconvenience in thus disposing of cases of this kind, and I think it the most equitable mode.

---

*Justice Howe, concurring.*

In this case there was a sale of lands, movables and slaves for the price of $18,000, and it is admitted that the estimated value of the lands and movables was one-half this sum. Six thousand dollars were paid in cash, and for the balance four notes were given of $3000 each. Three of these notes were paid. As obligations, they have been extinguished. There is no longer any legal question as to them. The remaining note of $3000 is now before us. It has never been paid or otherwise extinguished, and we are now called upon to enforce it. To the extent of one-half, its consideration is valid, and to that extent the holder is entitled to judgment. As to the other half, the jurisprudence of the State, as settled by repeated decisions, has declared that it can not be enforced. For these reasons I concur in the decree just pronounced, believing that it in no way enforces a contract for the sale of persons.

---

*Chief Justice Ludeling dissenting :*

I cannot concur in the views expressed by the court in this case.

The prohibition in the constitution is : "*All* contracts for the sale of persons are null and void, and shall not be enforced by the courts of this State."

In Groves *v.* Clark & Carnal (21 An. 567), this court, commenting on the article, said : "Article 128 of the constitution is couched in clear

and unambiguous language.    Its terms are unequivocal, its expression imperative."    *    *    *    *    *    *    *    *

"In the face of this paramount authority, so plainly enunciated, can the courts of this State enforce contracts which it reprobates, whether the holder of the obligation is in good or bad faith, or the holder before or after maturity?    The positive prohibition of article 128 makes no exception in favor of one class of holders over another.    Shall the courts make such an exception?"

"None dispute that obligations of the sort in question are, by the terms of the article 128 of the constitution, *utterly and absolutely* null and void in the hands of the original parties.    If thus stricken with nullity, what is to revive and give them validity?    We hold the purpose of article 128 of the constitution of the State to be clear and without doubt, and that *that purpose* is, that *the contracts, which it reprobates, shall be null,* in whose hands soever they are found, and that the courts are forbidden to enforce them, whether held by owners *bona fide* or *mala fide,* and without reference to the time they acquired them."

If we apply the reasoning of the court to this case, to what conclusion are we driven!    "The positive prohibition of article 128 makes no exception in favor of one class of holders over another."    Does it make any exception in favor of a contract which is only in part for the sale of persons?    "*All* contracts for the sale of persons shall be null and void, and shall not be enforced by the courts of this State."    Does the obligation sued on arise from a contract for the sale of persons?    This is not denied.    There was but *one contract,* and slaves as well as lands and personal property were embraced in it.    In the same case we said: "By the decision in the case of Wainwright v. Bridges, followed by many decisions affirming it, it was fully settled *that contracts for the payment of the price of slaves were null, and that the courts could not enforce them.*    These decisions were *the settled law* of the State *before the adoption of the constitution of* 1868.    There was no call for the insertion of the article 128 of the constitution if the framers of the organic law *did not intend to render null and abortive,* in the hands of any holder whatever, *all obligations of the kind treated of."*    What are the kinds of contracts treated of?"    "All contracts for the sale of persons."    The constitution does not say that only so much of the contract as relates to the price of the slaves shall be null, for that much was already deci o l to be null by the courts, but it declares that all such contracts shall be entirely null.

Under a strict construction of article 128 of the constitution no part of the contract can be enforced by the courts of the State.

If we adhere to the doctrine enunciated in the case of Wainwright v. Bridges, so long followed by us, the result would be the same, even if we were permitted to disregard the prohibition in the constitution—because a contract which is tainted, in part, with an *immoral* consideration, is void *in toto,* under the English and American, as well as under the civil law and the laws of this State.    Cole *v.* Cole, 7 N. S.

423; 19 An. 33, 339; 2 Pothier (Evans) pp. 17 and 18; Story Promissory notes, page 190; Smith Mer. Law, 344; Parson's Contracts, vol. 1, page 445, vol. 2, page 673; 11 Wheaton, 258; 2 Peters, 527; 14 How. 38; 16 How. 314; 17 How. 232; Chitty on Contracts, pp. 692, 693.

Reference has been made to a case in 6 Mass. Rep. p. 380, in support of a contrary view. I humbly conceive that the authority supports my position, if it can be said to decide anything on the question. Parsons, C. J., said: "This action is assumpsit on a promissory note for the delivery of slaves, and the payment of *bars,* which are an African currency, *and also* on an *insimul computassent."*    *    *    *    *

"*The second* objection that no action, upon either of the promises alleged, can be maintained in this State, is principally relied on by the defendant." * * "The slave trade, he has argued, is, *or has been prohibited* by a statute of the Commonwealth, in the preamble to which it has been declared to be an unrighteous commerce, and he attempted to show that *in itself it was immoral.* This objection deserves much consideration."

The court then states, that, by the common law, upon principles of national comity, a contract made in a foreign place, or to be executed there, if valid by the laws of that place, may be a legitimate ground of action in the courts of Massachusetts, although such contract may not be valid by our laws. There are two exceptions to this rule: when the commonwealth or its citizens may be injured by giving effect to the contract, or when the giving effect to the contract would exhibit to the citizens of the State an example pernicious or detestable; and, the court says, such contracts cannot be enforced because the consideration is *immoral,* and a judgment in support of it would be pernicious from its example. "And, perhaps, all cases may be considered as within this second exception, which are founded on *moral turpitude,* in respect either of consideration or the stipulation." "Laying the count *on the note out of the case,* we shall consider the question of *moral turpitude,* so far as it respects the count on the *insimul computassent;* and we are satisfied that *the objection does not apply* to the contract averred on *in this count."*

What was the contract averred on in *that count?* The defendant had agreed to deliver to the plaintiff a certain number of *slaves and bars* for a cargo of *merchandise.* The merchandise was delivered, and the defendant delivered a part of the slaves, "and having become the creditor of the plaintiff for supplies furnished to his use, *states his account,* in which, after deducting the slaves delivered and the supplies furnished, *he acknowledges a balance in cash, and the plaintiff having assented to the account,* demands *the balance in this action."* The suit was on a new contract in which *money* was acknowledged to be due for *merchandise* received, *not slaves.* The court said very properly,

"we see no legal objection to his recovery. The consideration of the *implied promise,* arising from *this settlement is the sale of the cargo,* which involves *no moral turpitude*—neither is the performance of the promise, *by paying the balance in cash, immoral.* And, although, on the same day, the defendant, *in consideration of this balance due in cash,* promises by his note to discharge it principally *in slaves,* and a small remainder in cash, *yet this promise is no bar to an action,* by the plaintiff *on the account,* even if the promise by the note is here considered as legal, and *a fortiori* if it be considered as void for its immorality." 6 Mass. R. 380.

If, departing from the plain terms of article 128 of the constitution, we construe it to mean that contracts for the sale of persons shall not be enforced, except to the extent of the *good consideration,* and we determine further, that the *good* can be separated from the *bad consideration* of the contract, still the result will be the same in this case, for we could enforce the payment of the *price* of the *land and personal property only,* and the payments already made largely exceed their price.

The vendor sold lands and slaves together for $18,000. It is admitted that the price of the slaves was $9000. Fifteen thousand dollars have been paid, and we are asked to enforce the balance. Would we not enforce the payment of the price of slaves, if by our judgment the vendor were enabled to collect any more money on his contract? Nine thousand dollars was the price of the lands. Every dollar which he *has received,* or which he *may receive,* through the aid of this court, over nine thousand dollars, will be on account of the price of the slaves. And, yet the judgment of this court will enforce *one-half* of the balance claimed, thus enabling him to collect $16,500.

The conclusion of my learned brothers seems to be predicated upon the supposition that there were *several debts,* evidenced by four notes; that the consideration of each note was slaves and land, and that by the payment of three of these notes (which were mere installments of one debt), the parties themselves *imputed* or applied the sums of money paid, equally to the slave and land consideration of *each note.*

This, in my judgment, is an error. There was but *one contract,* from which arose *one debt,* to wit: the obligation to pay the price of the property bought, and which was secured by one mortgage.

The fact that *the debt* was payable *in installments* did not destroy the unity of the debt. C. P. article 686.

Suppose A sell to B a tract of land for $10,000, payable in four equal installments, evidenced by four notes. B pays two of the notes, and then he is evicted of one-half of the lands bought, worth $5000. A sues B on the unpaid notes, and B pleads *the failure of consideration* to the extent of the value of the land taken from him. Would any court hold that *one-half* of the unpaid notes could be collected because the consideration of those notes had only failed to the extent of *one-half* ?

In case there is only a *partial want* of consideration, the obligation is affected with nullity *pro tanto*.  " The same rule applies to cases where there was *originally no want of consideration*, but there has been a *subsequent failure* thereof, either in whole or in part." Story's Prom. Notes, No. 187.

" There is no difference between a *want and a failure* of consideration."  12 M. 403.

If there was failure of consideration, there was *no debt*, and when there is no debt there can be no question of imputation of payment, or payment.  4 Marcadé No. 667 ;  C. C. 2129.

There being but *one debt*, and that only to the extent of the price of the land, $9000, every dollar paid went to the extinguishment of that debt.

"It shall always be intended, that if money is paid, it shall be applied to the discharge of that which the debtor was *legally* owing, and not upon that which (so to speak) he was owing illegally."  9 Iowa 384; Smith, Twogood & Co. *v.* Coopers & Clark.  "When the contract under which the wrong was perpetrated, and which has been in part performed, is brought before the courts by the immediate parties to it for further enforcement, *reason and good morals, as well as law*, dictate that, *as far as possible*, the wrong should be made right." *Ibid.*

But if the courts of this State are powerless to recognize the existence of a debt for slaves at all, since the adoption of the constitution of 1868, and the fourteenth amendment to the constitution of the United States, and the question of imputation could have arisen under the contract, how would the payments have been imputed ? ·

The imputations must be made *expressly and at the time of the payment, by one or the other of the parties*, or *the law* will make it.  C. C. 2160, 2162.

The record does not show that either of the parties *expressly made* any imputation—hence the law made it.  How ?  By applying the money to *the debt* which the *debtor* had most interest in paying.  After the decision of the case of Wainwright *v.* Bridges, and the numerous cases since decided, affirming the principles therein enunciated, the least that can be said of the titles to slaves is that they were *precarious;* and if precarious, the debtor had most interest in discharging the price of the lands.

In Hynes *v.* Cobb, 2 An. 364, this court said the amount promised to be paid in the note was composed of the sum loaned with twenty per cent. added thereto, on which interest was stipulated at the rate of ten per cent. after maturity.  "An indorsement was made on the note of a payment of $240.  *No imputation is expressed in the receipt,* nor otherwise shown.  In an ordinary case *the law* would make the imputation to the interest.  But the article of the code, which directs *that* impu-

tation must be construed in connection with other rules *in pari materia.*
One of these is, where the receipt bears no imputation the payment
must be imputed to the debt, which the debtor had at the time most
interest in discharging, of those that are *equally due.*" 2 An. 362; 5
An. 620.

But I consider that we have decided the precise principle involved
in this case.

In Brou *v.* Becnel, 20 An. 254, the suit was for *the balance of notes*
given for *lands and slaves.* The answer alleged that *the consideration
thereof had failed* by reason of the emancipation o, the slaves included
in the sale, and that the full value of the land had been long since
paid. The issue presented by the pleadings in that case was precisely
the one now presented for decision. And this court said: "We con-
clude that Becknel *can oppose the plea of failure of consideration* as to
both the *personal and real obligation;* but the evidence does not show
the *relative value of the slaves* and the *other property sold;* and we
think that justice requires the remanding of the cause *to ascertain this
fact,* and the *amount,* if any, for which she is liable *for property other
than slave property.*"

In Haden *v.* Phillips & Foster, 21 An. 517, we held that payments
made on an obligation given for land and slaves must be credited on
the price of the land. Why? Because "the *law* will not presume that
the payments made by him were for their price, *but must be held to have
been made on that which was, and is property.* And, besides, to make
him pay the balance claimed, would virtually be enforcing a contract
for the sale of persons, by *making him pay more than the full value of
the land and movables bought by him?* See, also, Dranguet *v.* Rost, 21
An. 538, and Armstrong *v.* Lecompte 527.

Again—Hortense Patin died in 1861, and on the *twenty-eighth of De-
cember of that year,* a sale of the effects of her succession was made.
At the sale certain slaves were purchased *by the heirs.* In 1867
an account was filed. The heirs opposed the account, alleging
that they were illegally charged with the amount of their pur-
chases of slaves. There was judgment rejecting the opposition so far
as the inheritance of each was concerned, that amount being deemed
to be settled by confusion to the extent of their purchases.

On appeal this court said,

"We are constrained to think that the judgment was erroneous;
*under the jurisprudence of the State, as well settled, the obligations con-
tracted by the heirs,* by their purchase of December, 1861, *being null and
void, cannot be an element in either confusion or compensation.   To recog-
nize them as such would be practically to enforce them.*" 19 An. 234;
Constitution, Art. 128; C. C. 2205, 2214.   See 21 An. 661.

I feel authorized therefore to assume that the question presented
here has been decided; and I think the rule *stare decisis* should con-

97

R. S. Sandidge v. J. S. Sanderson, and J. S. Sanderson v. R. S. Sandidge.   (Cumulated.)

trol us in cases like this, even if we doubted the correctness of the previous rulings; but I am not convinced that there is error in these decisions; on the contrary my judgment approves the opinions rendered in Brou v. Becnel, Groves v. Clark & Carnal, Dranguet v. Rost, Armstrong v. Lecompte, Haden v. Phillips & Foster, and the succession of Hortense Patin. The plaintiff's demand should be rejected.

*Justice Howell, dissenting.*

I concur in the opinion of the Chief Justice, that the question involved in the controversy has been settled in several cases, decided during the recent summer terms of this court, in which the legitimate and logical application of the principles and doctrines of the Wainwright and subsequent similar decisions was made. See Haden vs. Phillips et al., 21 A. 517; Armstrong vs. Lecomte, *ib.* 527; Dranguet vs. Rost, *ib.* 538; Groves vs. Clark et al., *ib.* 567; Suc. Hortense Patin, *ib.* 661. The only theory on which the conclusion of the majority of the court, in this case, can in any way be reconciled with the existing jurisprudence on the subject, is that the contract has been voluntarily executed *pro tanto* by the parties as to the slave consideration. But a contract cannot properly be considered as executed, in the sense of that term in this connection, as long as there is any portion of it to be enforced, and during such time, the debtor may set up any defenses he may have to its enforcement, and claim the benefit of any payments made by him. Without direct, positive proof that the payments were made on the price of the slaves, we should not, under our jurisprudence and the constitution, *presume* that they were so made. I can but think that the decision in this case is in conflict with our jurisprudence on the subject.

---

### ON APPLICATION FOR REHEARING.

In this case, the injunction having been maintained to the extent of the slave consideration, the costs of the lower court should be borne by the defendant.

It is therefore ordered that the judgment of this court, rendered on twenty-ninth November, 1869, be amended so as to make the defendant in injunction pay the costs of both courts; and the rehearing prayed for is refused.