CHARLES H. McBLAIR, ADMINISTRATOR OF LYDE GOODWIN, DECEASED, *v.* ROBERT M. GIBBES AND CHARLES OLIVER, EXECUTORS OF ROBERT OLIVER, DECEASED.

In 1816 an association, called the Baltimore Company, was organized in Baltimore for the purpose of furnishing advances and supplies in fitting out a military expedition under General Mina, against Mexico, then a part of the dominions of the King of Spain. See 11 How. 529, and 12 Ib. 111; 14 Ib. 610.

An assignment of a share in this company, made in 1829 to a *bonâ fide* purchaser for a valuable consideration, was valid.

Although the transaction was illegal 'n 1816, and had not changed its character in 1829, yet the assignment was not tainted with any illegality. The claim against Mexico, as being one of the efforts to establish her independence of Spain, rested entirely upon her sense of honor in acknowledging the obligation after her independence was achieved; but after the debt was admitted, the *bonâ fide* assignee became substituted to all the rights of the original shareholder.

The cases examined, showing how far a *bonâ fide* assignee of an illegal contract can claim and enforce his contract of assignment.

An assignment of " all my undivided ninth part, right, title, and interest, of every kind whatever, in the claim," carried with it an assignment of a claim to commissions as well as the share itself.

Moreover, the original holder, or his representatives, would be estopped from claiming the proceeds, after they had been received by his *bonâ fide* assignee.

THIS was an appeal from the circuit court of the United States for the district of Maryland, sitting as a court of equity.

The controversy related to a share in the Mexican Company, which was held by Goodwin, and also to a claim on his behalf, to a commission of five per centum upon the proceeds in virtue of his agency, and under an agreement with the company.

The nature of this case has already been explained in the preceding volumes of these reports, and is again touched upon in the opinion of the court in the present case. The reader is referred to 11 How. 529; 12 Ib. 111; and 14 Ib. 610.

The bill was originally filed by McBlair, in a state court, but was removed into the circuit court of the United States by Gibbes and Oliver, who stated themselves to be citizens of the State of New York.

On the 13th of March, 1852, McBlair took out letters of administration upon the estate of Lyde Goodwin, from the orphans' court of Baltimore city; and filed his bill to recover from the executors of Oliver, the proceeds of Goodwin's share in the company, and also his commission of five per centum. The claim rested upon the allegation that all the assignments which Goodwin had made to Oliver were void, as was also the purchase by Oliver, of Goodwin's interest from his trustee in insolvency. If these were void, the proceeds of the share would of course belong to Goodwin's personal representatives.

On the 3d of December, 1853, the circuit court dismissed the

bill with costs, whereupon the complainant appealed to this court.

It was argued by *Mr. Davis* and *Mr. Robert N. Martin*, for the appellant, and by *Mr. Campbell* and *Mr. John on*, for the appellees. Only those points of the argument will be noted, upon which the opinion of the court rested, viz : the validity or invalidity of the assignments to Oliver.

The counsel for the appellant contended that the assignment from Goodwin to Oliver, made in 1829, was void, because : —

It must be considered as settled by this court —

1. That the purposes and dealings of the Mexican Company, were illegal, and by the laws of the United States, not less than those of Maryland, void.

2. That till some change was wrought the claim of the company was not assignable, but that any assignment was void.

3. That no such change as made the claim either valid or assignable, was wrought by any act prior to the treaty of 1839.

4. That neither the treaty nor the award operated retroactively to make valid prior acts. Therefore the assignments are void, and nothing passed by them. Gill *v.* Oliver, 11 How. 529; Williams *v.* Oliver, 12 Ib. 111; Deacon *v.* Oliver, 14 Ib. 610; Kennet *v.* Chambers, 14 Ib. 38, 49, 51, 52. The assignment of 1829 was not binding on Goodwin, because there is no proof of the release of the debt on the books of Oliver.

Upon this branch of the case, the counsel for the appellee contended, as a 5th point : —

5. But conceding, for argument sake, that the appellant may urge without impediment the illegal act of him whom he represents, on what ground does he assail the assignment of Goodwin of 1829 ?

That the claim was not validated till 1839, if true, will not avail him, because equity will not permit an assignor to defeat his own assignment by procuring a good title subsequently for his own benefit, but will hold such subsequent acquisition to enure to the assignee's benefit.

2 Smith's Leading Cases, 464; 1 McLean, 384; 2 Story. 630; 11 How. 325; 3 Story, 175; 2 Serg. and Rawle, 507; 2 Barr, 325.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the circuit court of the United States for the district of Maryland.

The bill was filed by the administrator of Lyde Goodwin against the executors of Robert Oliver, to recover the proceeds of a share in an association called the Baltimore Company,

20*

which had a claim against the Mexican government, that was allowed under the convention of 1839, " for the adjustment of claims of citizens of the United States against the Mexican Republic." The claim of the company was founded on a contract with General Mina, in 1816, for advances and supplies in fitting out a military expedition against the dominions of the King of Spain. The bill also sought to recover a commission of five per centum, which the members of the company had agreed to give to Goodwin, for his services as agent in soliciting the claim against Mexico. The share and commissions, as charged, amount to $67,337.15.

The executors of Oliver set up a right to retain the fund for the benefit of the estate, under and by virtue of a purchase of Goodwin's share in this company, and also of his right to the commissions, by their testator, in 1829. The purchase and transfer took place the 30th May, in that year, for a good and valuable consideration.

A question was made on the argument, whether or not the assignment of Goodwin was sufficiently comprehensive to include a right to the commissions as well as to the proceeds of the share. We are satisfied that it is. The language is very broad: " All my undivided ninth part, right, title, and interest, of every kind whatever, in the claim on the government of Mexico," &c. And again : " The object and intention of this agreement is to make a full and complete transfer to the said Robert Oliver, of all my right, title, and interest aforesaid," &c. The commissions were dependent upon the allowance of the claims of the company against Mexico, and, of course, an interest intimately connected with them ; without the allowance of the one, the other would be valueless.

The understanding of Goodwin himself, of the intention and effect of the assignment, accords with this view, as derived from his deposition taken in behalf of the claims of the company, and used before the board of commissioners ; and also from his testimony in the proceedings before the Baltimore county court, for the distribution of the fund among the several claimants.

This share of Lyde Goodwin in the company, and his commissions, have heretofore been the subject of consideration in this court. The case is reported in 11 How. 529. George M. Gill, the permanent trustee of Goodwin, who had taken the benefit of the insolvent laws of Maryland in 1817, claimed this fund before the Baltimore county court as part of the estate of the insolvent, against the right and title of the executors of Oliver, claiming under this assignment of 1829. The Baltimore county court held that the fund passed by the insolvent assignment of 1817, to Gill, the permanent trustee. The case was

taken to the court of appeals of Maryland, where the decree was reversed, and the fund distributed to Oliver's executors, the appellate court holding that the contract of the company with General Mina was made in violation of the neutrality act of the United States of 1794, and, being thus founded upon an illegal transaction, constituted no part of the property or estate of the insolvent within the meaning of the Maryland insolvent laws. Gill brought the case to this court under the 25th section of the judiciary act, for the purpose of revising that decision; but the court dismissed the case for want of jurisdiction, a majority of the judges holding that the only question involved in the decision below was the true construction of a statute of the State, and that it belonged to the Maryland court to interpret its own statutes. Whether that interpretation was right or wrong, was a matter with which this court had no concern.

Gill, the permanent trustee, having thus failed to establish a title to the fund under the Maryland insolvent laws, the litigation is again revived respecting the fund, in behalf and for the benefit of the personal representatives of Goodwin, on the ground that the moneys realized upon the contract with General Mina, from the Mexican government, is to be regarded as a subsequent acquisition of property by the insolvent, belonging to his estate, and to be dealt with accordingly.

Hence this bill filed against the executors of Oliver to recover possession of the fund. The defence set up to this demand of the administrator of Goodwin, and which it is insisted is conclusive against him, is the assignment of the contract of General Mina, by Goodwin himself, to Robert Oliver, in 1829, which has been already referred to; that having thus parted with all his right or claim to that contract, for a full and valuable consideration, the proceeds thereof derived from the recognition and fulfilment by the Mexican government belong to the estate of Oliver, and not to that of Goodwin; and vested his executors with the equitable right to receive the moneys, and which have been paid accordingly under the decree of the court of appeals of Maryland, in making a distribution of the fund.

It is urged, however, in answer to this view, that the contract with General Mina being illegal, the sale and assignment of it from Goodwin to Oliver must also be illegal, and consequently that no interest therein, equitable or legal, passed to Oliver's executors.

But this position is not maintainable. The transaction, out of which the assignment to Oliver arose, was uninfected with any illegality. The consideration paid was not only legal, but meritorious, the relinquishment of a debt due from Goodwin to him. The assignment was subsequent, collateral to, and wholly

independent of, the illegal transactions upon which the principal contract was founded. Oliver was not a party to these transactions, nor in any way connected with them.

It may be admitted that even a subsequent collateral contract, if made in aid and in furtherance of the execution of one infected with illegality, partakes of its nature, and is equally in violation of law; but that is not this case. Oliver, by the assignment, became simply owner in the place of Goodwin, and as to any public policy or concern supposed to be involved in the making, or in the fulfilment of such contracts, it was a matter of entire indifference to which it belonged. The assignee took it, liable to any defence, legal or equitable, to which it was subject in the hands of Goodwin. In consequence of the illegality the contract was invalid, and incapable of being enforced in a court of justice. The fulfilment depended altogether upon the voluntary act of Mina, or of those representing him.

No obligation existed, except what arose from a sense of honor on the part of those deriving a benefit from the transaction out of which it arose. Its value rested upon this ground, and this alone. The demand was simply a debt of honor. But if the party who might set up the illegality chooses to waive it, and pay the money, he cannot afterwards reclaim it. And, if even the money be paid to a third person for the other party, such third person cannot set up the illegality of the contract on which the payment has been made, and withhold it for himself. In Faikney *v.* Renous, 4 Burr. 2069, where two persons were jointly concerned in an illegal stock-jobbing business with a third, and a loss having arisen, one of them paid the whole, and took a security from the other for his share, the security was held to be valid as a new contract, uninfected by the original transaction. And in Petrie *v.* Hannay, 3 T. R. 418, where one of the partners, under similar circumstances, paid the whole at the instance of the other, he was allowed to recover for the proportionate share. These cases are examined and approved in Armstrong *v.* Toler, 11 Wh. 258.

In Tenant *v.* Elliot, 1 B. and P. 3, the defendant, a broker, effected an insurance for the plaintiff which was illegal, being in violation of the navigation laws; but on a loss happening, the underwriters paid the money to the broker, who refused to pay it over to the insured, setting up the illegality, upon which an action for money had and received was brought. The plaintiff recovered, on the ground that the implied promise of the defendant, arising out of the receipt of the money for the plaintiff, was a new contract, not affected by the illegality of the original transaction. The same principle was applied and enforced in the case of Farmer *v.* Russell, 1 B. and P. 296.

In Thomson *v.* Thomson, 7 Ves. 470, there had been a sale of the command of an East India ship to the defendant, and as a consideration he stipulated to pay an annuity of £200 to the previous commander so long as he should continue in command of the ship.

This contract of sale was illegal. Subsequently the defendant relinquished the command, and another person was appointed in his place. But, under the regulation adopted by the East India Company to prevent the sale of the commands of their ships, an allowance was made to the defendant, on his retiring, of £3,540.

The bill in this case was filed for the purpose of procuring a decree for the investment of a portion of this fund to satisfy the annuity of £200, praying that the value of it might be ascertained and paid out of the money allowed by the company.

The objection made was, that the contract providing for the annuity was illegal, and a court of equity therefore would not interfere.

The master of the rolls, Sir William Grant, agreed that the contract was illegal; he admitted there was an equity against the fund, if it could be reached by a legal agreement; but observed, " you have no claim to this money, except through the medium of an illegal agreement, which, according to the determinations, you cannot support." " If the case," he further observed, " could have been brought to this, that the company had paid this into the hands of a third person for the use of the plaintiff, he might have recovered from that third person, who could not have set up this objection as a reason for not performing the trust;" " but in this instance the money is paid to the party." " There is nothing collateral in respect to which, the agreement being out of the question, a collateral demand arises, as in the case of stock-jobbing differences."

So, in Sharp *v.* Taylor, 2 Ph. Ch. R. 801, the bill was filed, among other things, to recover a moiety of the freight money, the whole of which had come into the hands of one of the joint owners. The defence set up was, that the trade in which the vessel had been engaged, and in which the freight had been earned, was in violation of the navigation laws, and illegal. But Lord Chancellor Cottenham answered, that the plaintiff was not asking for the enforcement of an agreement adverse to the provision of the act of parliament, nor seeking compensation and payment for an illegal voyage; that, he observed, was disposed of when Taylor (the defendant) received the money; the plaintiff was seeking only his share of the realized profit.

Again, he observed, can one of two partners possess himself of the property of the firm, and be permitted to retain it, if he

can show that, in realizing it, some provision in some act of parliament has been violated? The answer is, that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do as between the parties. The difference, he observes, between enforcing illegal contracts, and asserting title to the money which has arisen from them, is distinctly taken in Tenant v. Elliot, and Farmer v. Russell, and recognized by Sir William Grant, in Thompson v. Thompson.

These cases show that the assignment of Lyde Goodwin to Robert Oliver, in 1829, being collateral to, and disconnected from the illegal transaction out of which the Mina contract arose, was valid and binding upon Goodwin, and vested in Oliver all the benefits and advantages, whatever they might be, derived from that contract.

The assignment from Goodwin to Oliver, though the assignment of an illegal contract—which contract, therefore, imposed no legal obligation, and rested simply upon the honor of the parties—was not within the condemnation of the Maryland insolvent laws, as expounded by her courts, as the right was not derived under but entirely independent of them. Those laws have no application to this assignment.

And further, that the money having been realized by his executors, according to the purpose and object of the assignment, becomes a part of the assets of the estate, which belong to the personal representatives.

Another ground may be briefly stated, which, in our judgment, is equally conclusive against the complainant. The assignment of 1829, of the Mina contract, not being tainted with illegality, and therefore obligatory upon Goodwin, if he were alive and claiming the fund against the representatives of Oliver, having parted with all his right in the subject to their testator, for a valuable consideration, would be estopped from setting up any such claim, and, of course, his personal representatives can be in no better situation.

We have not deemed it necessary to look into the case for the purpose of ascertaining whether Goodwin, at the time of the proceedings in the Baltimore county court, had such notice of them as required that he should have appeared there and asserted his right; and hence, that the decree of that court, in the distribution of the fund, was conclusive upon such right. That question is unimportant, inasmuch as, in our opinion, the executors of Oliver have, independently of that ground, established a complete title to the fund in controversy.

We think the decree of the court below was right, and should be affirmed.

Mr. Chief Justice TANEY.

I shall state my opinion in this case, in the cases of Williams's administrator, and Gooding's administrator, as the three cases are nearly connected, and depend on the same principles.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Maryland, and was argued by counsel. On consideration whereof it is now here ordered, adjudged, and decreed by this court, that the decree of the said circuit court in this cause be and the same is hereby affirmed with costs.