DICKSON ET AL. *v.* UHLMANN GRAIN CO.

No. 63. Argued November 16, 17, 1932.—Decided February 6, 1933.

*Mr. S. J. Jones* for petitioners.

*Mr. Paul R. Stinson,* with whom *Messrs. Arthur Mag* and *Roy B. Thomson* were on the brief, for respondent.

190

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

Uhlmann Grain Company, an Illinois corporation, brought this action of contract in the federal court for western Missouri against A. P. Dickson, a citizen and resident of Carrollton in that State. Four other cases of like character were, by agreement, consolidated with this one; and the five cases were tried below and are brought here as a consolidated suit. The pleadings, facts and proceedings stated in respect to the Dickson suit are applicable to all. The petition alleged that Dickson employed the company as a broker to purchase and sell for him grain on the Chicago, Minneapolis and Winnipeg exchanges; that he agreed to pay it commissions for such service and to reimburse it for any advances made; and that upon an account stated there is due a balance of $3,714.06, after crediting amounts received from the proceeds of purchases and sales and as margins.

Dickson denied the indebtedness and pleaded further in bar that the transactions out of which the indebtedness is alleged to have arisen were conducted wholly within the State of Missouri and were gambling, illegal under its

laws; that no purchase or sale of grain was made for him and that none for him was contemplated by either party; that the intention of both was merely that the defendant should settle for differences in the market prices; that the transactions were not actual dealings by him in grain futures but dealings which as to him were wholly fictitious or pretended, and in fact merely gambling on the rise and fall of the market prices of grain.

The company replied that the obligation sued on arose from transactions in the purchase and sale of grain for future delivery as commonly conducted on boards of trade; that these transactions were carried out on the boards of trade of Chicago and Minneapolis which had been designated by the Secretary of Agriculture under The [Federal] Grain Futures Act, September 21, 1922, c. 369, 42 Stat. 998, as "contract markets"; that the company was a member of each of said boards; and that each of the transactions of purchase and sale made by the company on behalf of Dickson was made by it with another member of the board and in compliance with the provisions of that Act.

The case was tried by the District Judge without a jury. Dickson contended that none of the alleged contracts made on the boards of trade was entered into on his behalf; that they were devices employed by the company on its own behalf in conducting at Carrollton what was actually a bucket shop in which to gamble in violation of the laws of the State; that he did not employ the company to make any contract for future delivery; that it was understood by him and the plaintiff, in each transaction, that receipt and delivery of the grain would not be required. On evidence which in abbreviated form occupies, besides the exhibits, 125 pages of the printed record, the judge found the facts as alleged in the plea in bar. He found specifically, among other things, that the transactions were wagering contracts "cloaked in the forms of

law "; and that the company's transactions with or for the customers occurred wholly in Missouri. He declined to make any. of the findings requested by the company, denied recovery and entered judgment for the defendant. A motion for a new trial was overruled.

The company appealed to the Circuit Court of Appeals and contended, among other things, (1) That there was no substantial evidence to support the finding that the transactions were fictitious or gambling transactions and hence invalid under the law of Missouri; and (2) That The Grain Futures Act superseded all relevant state laws relating to the subject of dealings in futures on " contract markets," and that the transactions in question, being valid under the federal Act, were necessarily valid under the laws of Missouri. The Circuit Court of Appeals, one judge dissenting, reversed the judgment of the District Court; and remanded the cause for further proceedings. 56 F. (2d) 525. This Court granted a writ of certiorari.

*First.* The defense of illegality is predicated not on things done, or to be done, in Chicago or Minneapolis or Winnipeg, but wholly upon things done in Missouri. Uhlmann Grain Company, a member of the boards of trade of Chicago, Minneapolis, Kansas City, Missouri, and Winnipeg, Canada, was engaged in the grain brokerage business. In 1924 it established a branch office at Carrollton, then a town of about 3200 inhabitants. It is not disputed that, upon receiving at Carrollton a purported order from Dickson, the Carrollton branch of the Grain Company communicated with its Kansas City office, and that the company thereupon entered into contracts on some other board of trade for future purchase or sale of grain. The contracts, so far as made within the United States, were entered into on either the Chicago or the Minneapolis board. Each of these boards had been designated by the Secretary of Agriculture a " contract market." The company was a member in good standing

of each of the boards. Each contract was made in the name of the company as principal with another member of the board as principal. Each contract was evidenced by a record in writing as prescribed by the Grain Futures Act. And after each such contract was entered into by the company, it mailed, from its office in Kansas City to its customer at Carrollton, a written confirmation of his alleged order and of its execution, which recited the date of the contract, the quantity and kind of grain bought and sold, the contract price per bushel of the commodity; the delivery month, and the place where the contract of purchase or sale was executed.[1] The requirements of the federal act appear to have been complied with. There is no suggestion that these contracts violated the law of the place where the exchange was situated. It may be assumed that they were valid as between the Uhlmann Grain Company and its fellow members of the exchanges.

But there were two distinct agreements: that between customer and company, in which both parties acted as principals; and that between the company and brokers on the exchange, in which both of the parties there likewise acted as principals. It does not follow that because the contracts between the members of the exchanges were

---

[1] The alleged confirmation stated also: "All transactions made by us for your account contemplate the actual receipt and delivery of the property and payment therefor. We reserve the right to close these transactions when deposits are running out, without giving further notice. We also reserve the privilege of clearing all transactions through Clearing Associations, if there be any, from day to day in accordance with the usage, rules and regulations of the Exchange where the trade is made, prevailing at the time. All purchases and sales made by us for you are made in accordance with and subject to the rules, regulations and customs of the Chamber of Commerce or Board of Trade where the trades are made and the rules, regulations and requirements of its Board of Directors, and all amendments that may be made thereto. This contract is made under authority of the Act of Congress known as 'The Future Trading Act.'"

valid, those entered into by the company at Carrollton with Dickson and its other customers were valid also. Compare *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 249–250. See, also, *Harvey* v. *Merrill,* 150 Mass. 1; 22 N. E. 49; *Riordon* v. *McCabe,* 341 Ill. 506, 512–515; 173 N. E. 660. Whether the customer, in his agreement with the company, ordered that contracts be entered into in his behalf on the exchange, is the serious issue of fact in the case at bar. If the customer did so order by his agreement, we should have to determine by the law of which state the defense of illegality is governed. If, as Dickson contends, and the trial court found, Dickson's agreement did not contemplate the execution of transactions on the exchange in his behalf, clearly the defense of illegality is governed by the law of Missouri, unless that law has been superseded by The Grain Futures Act.

*Second.* There was evidence that the transactions out of which the indebtedness is alleged to have arisen were not in fact orders to enter into contracts on behalf of the defendants to purchase or sell for future delivery but were devices knowingly employed by the company solely to enable them to gamble. They testified that they were assured by the local manager that they would never have to receive or deliver any grain as a result of their speculations. And there is no lack of evidence to support a finding that in doing so the manager acted within the scope of his authority. It is admitted that no grain was actually delivered by or to the plaintiff's customers. The accounts of the defendants were carried on margin; and the extent of their purported obligations exceeded their financial capacity. It is clear that their purpose was solely to make a profit by reason of the fluctuations in the market price of grain; and that the plaintiff knew this. The Carrollton office was equipped in a manner common to bucket shops; its furnishings consisted of a desk, chairs,

a typewriter, blackboard, and telegraph instrument. The branch manager testified, as did the defendants, that he was active in soliciting business among the townspeople. Between 40 and 50 local residents from widely divergent walks of life in no way connected with purchasing or selling grain became customers of the branch. Of the five defendants in the cases consolidated for trial, who were the plaintiff's largest customers at Carrollton, two were farmers, two were clothing merchants, and one was an ice dealer. These defendants, who were not in the grain business, who had never traded on a grain exchange, and who had no facilities for handling grain, purported to buy and sell in amounts up to 50,000 bushels in a single transaction. In a period of nine months the total number of bushels involved in the transactions of four of the defendants, according to one of the plaintiff's witnesses, was 2,360,000. The defendants undoubtedly knew that the company regularly entered into contracts on the exchanges corresponding to the transactions at Carrollton. But the evidence warrants the conclusion that the contracts on the exchange were entered into by the company to enable it to secure the data for the defendants' wagers and to provide the means for determining the defendants' gains and losses; and that both the plaintiff and the defendants so regarded the contracts on the exchanges. So far as concerned the obligations which they undertook, the customers were in the same position as if they had simply wagered against the company on the fluctuations in the prices of grain. Thus, the evidence supports the conclusion that the transactions between the defendants and the company were executed and performed wholly in Missouri; and the law of Missouri accordingly governs, unless prevented by the federal act.

The burden was on the defendants to establish the defense of illegality under the law of Missouri, *Crawford v. Spencer*, 92 Mo. 498, 506; 4 S. W. 713; and the evidence

was ample to support the conclusion of the trial court that the defense had been sustained. The Missouri Bucket Shop Law, Rev. Stat. (1929), §§ 4316–4323, defines transactions in grain declared to constitute gambling and makes it punishable either to enter into the prohibited transactions or to keep a place where they are entered into. Section 4317 declares that a bucket shop is a place wherein the person carrying on the shop goes through the form of buying and selling certain commodities for other persons " at prices fixed or pretended to be fixed by trades or transactions made or offered to be made in same on boards of exchange or otherwise, but wherein there is in fact no actual purchase and sale, or sale and purchase of such commodity for or on account of the party or parties thereto." The statute further provides in § 4318 that all such " pretended " sales or agreements, " wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared gambling and criminal acts, whether the order or contract for the pretended purchase or sale of such property purports to be offered, accepted, executed, or consummated in this state or in any other state or country: *Provided*, the offer to make such pretended purchase or sale of said property is placed or given or communicated from this state; and any person violating the provisions of this section shall be guilty of a felony." [2]

<hr>

[2] The defense rests solely on Mo. Rev. Stat. (1929), §§ 4316 to 4323; not on §§ 4324–4326, 4329. The former sections derive from Mo. Laws 1887, p. 171; the latter, from Mo. Rev. Stat. (1889) §§ 3931-3936; see *State* v. *Long*, 261 Mo. 314, 316; 169 S. W. 11. The latter sections prohibit the purchase or sale of grain on margin where there is an intention not to make or receive delivery, and declare contracts made in violation of this prohibition void, even if only one of the parties to the contract has an intention not to deliver. Under the latter sections it has been held that such an intention on the part of a customer for whom a broker has executed future contracts is

The state statute imposed a criminal penalty for the negotiation of what was at common law an illegal contract. Compare *Irwin* v. *Williar*, 110 U. S. 499, 508–510; *Embrey* v. *Jemison*, 131 U. S. 336, 345. Under the Missouri statutes it is no defense to a criminal prosecution that the company entered into transactions for future purchases and sales on a contract market, even where the illegality consists in dealing in futures on margin. *State* v. *Christopher*, 318 Mo. 225; 2 S. W. (2d) 621.[3] In the case at bar the company was a party to the illegal con-

---

sufficient to defeat the broker's claim for commissions, even though he was unaware of that intention, *Price* v. *Barnes*, 300 Mo. 216, 229, 231; 254 S. W. 33; but that the provisions do not apply where the execution of the contracts occurred in another state pursuant to orders given to the broker in Missouri. *Edwards Brokerage Co.* v. *Stevenson*, 160 Mo. 516, 527-528; 61 S. W. 617; see *Connor* v. *Black*, 119 Mo. 126, 141; 24 S. W. 184; *Price* v. *Barnes*, *supra*, at p. 232; also, *Elmore-Schultz Grain Co.* v. *Stonebraker*, 202 Mo. App. 81; 214 S. W. 216; *Claiborne Commission Co.* v. *Stirlen*, 262 S. W. 387. These cases have no application in the case at bar.

[3] Compare the statutes enacted in recent years in several states, declaring that contracts for future delivery of grain and other commodities are valid and enforceable if made according to the rules of an exchange, actually executed on the exchange and performed or discharged according to its rules, and made with or through a member in good standing: Ark. Acts 1929, No. 208, Ark. Dig. Stat. (1931 Supp.) §§ 2661a-2661k; Ga. Acts 1929, p. 245, Ga. Code (1930 Supp.); §§ 4264(1)-4264(8); Miss. Acts 1928, c. 304, Miss. Code (1930) §§ 1827-1837; Okla. Laws 1917, c. 97, Okla. Stat. (1931), c. 15, art. 24; S. Car. Acts'1928, No. 711, S. Car. Code (1932), §§ 6313-6321; Tex. Acts 1925, c. 15, Tex. Rev. Pen. Code (1925), arts. 656-664. The South Carolina and Texas statutes contain a proviso declaring that such contracts shall be unlawful where it is not " contemplated " by the parties that there be actual delivery; and the Georgia statute contains a proviso declaring such contracts unlawful where it is not " stipulated " by the parties thereto that there shall be actual delivery. For an analysis of the state statutes concerning dealings in futures, see 45 Harv. L. Rev. 912-925. Compare E. W. Patterson, Hedging and Wagering on Produce Exchanges, 40 Yale L. J. 843.

tracts with its customers; and hence it cannot recover for commissions or for advances. The trial court accordingly was right in entering judgment for the defendants, unless the Missouri law has been superseded by the federal act.

*Third.* The Grain Futures Act did not supersede any applicable provisions of the Missouri law making gambling in grain futures illegal. The Grain Futures Act recites in § 3 that transactions in grain involving the sale thereof for future delivery as commonly conducted on boards of trade and known as "futures" are affected with a national public interest; that they "are susceptible to speculation, manipulation and control"; and that the resulting obstruction to and burden upon interstate commerce in grain and the products and by-products thereof "render regulation imperative for the protection of such commerce." Section 4 declares that "it shall be unlawful" to engage in such transactions except, among other things: "(b) Where such contract is made by or through a member of a board of trade which has been designated by the Secretary of Agriculture as a 'contract market,' . . . and if such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery."

The federal act declares that contracts for the future delivery of grain shall be unlawful unless the prescribed conditions are complied with. It does not provide that if these conditions have been complied with the contracts, or the transactions out of which they arose, shall be valid. It does not purport to validate any dealings. Nor is there any basis for the contention that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded. The purpose of the Grain Futures Act was to control the evils of manipulation of

prices in grain.[4]   Such manipulation, Congress found, was effected through dealings in grain futures.   See *Board of Trade* v. *Olsen*, 262 U. S. 1, 32.   Many persons had advocated, as a remedy, that all future trading be abolished.[5]   Congress took a less extreme position.   It set up a system of regulation and prohibited all future trading which did not comply with the regulations prescribed.   But it evinced no intention to authorize all future trading if its regulations were complied with.   Both the language of the act and its purpose are clear; and they indicate the contrary.   The Missouri law is in no way inconsistent with the provision of the federal act.   It does not purport to legalize transactions which the federal act has made illegal.   It does not prescribe regulations for exchanges. Obviously, manipulation of prices will not be made easier, or the prevention of such manipulation be made more difficult, because the State has declared that certain dealings in futures are illegal and has forbidden the mainte-

---

[4] See the remarks of Mr. Tincher, chairman of the committee reporting the bill, before the House.   62 Cong. Rec., 67th Cong., 2d Sess., p. 9434.   The title of the Act is "An Act for the prevention and removal of obstructions and burdens upon interstate commerce in grain by regulating transactions on grain futures exchanges, and for other purposes."   A cardinal argument for the passage of the Grain Futures Act was the severe decline in prices on the Chicago board of trade subsequent to the decision in *Hill* v. *Wallace*, 259 U. S. 44, holding sections of the Future Trading Act unconstitutional. See H. R. No. 1095, 67th Cong., 2d Sess., p. 2; Sen. No. 871, 67th Cong., 2d Sess., p. 7; 62 Cong. Rec., p. 12733; compare, *id.*, p. 9429.

See, also, the statements of the purpose of the Future Trading Act, H. R. No. 44, 67th Cong., 1st Sess., p. 2; Sen. No. 212, 67th Cong., 1st Sess., p. 4; and the disavowal of an intention to "legalize" gambling, 61 Cong. Rec., 67th Cong., 1st Sess., pp. 1313, 1339–1340, 1370, 1374.

[5] See *id.*, p. 9428.   For a summary of prior bills introduced in Congress for the control of future trading, some of them providing for its prohibition, see G. W. Hoffman, Future Trading Upon Organized Commodity Markets, pp. 364–367.

nance within its borders of places where they are carried on. Since there is nothing in the state law which is inconsistent with, or could conceivably interfere with the operation or enforcement of, the federal law, the statute of Missouri was not superseded. Compare *Savage* v. *Jones*, 225 U. S. 501, 533.[6]

*Reversed.*

MR. JUSTICE BUTLER, dissenting.

I am unable to join in the decision just announced. My understanding of the evidence constrains me to dissent.

Sections 4316–4323, Mo. R. S., 1929, prohibit bucket-shop transactions in Missouri. Section 4318 denounces as gambling pretended purchases and sales "wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto." This Court rests its decision solely on that provision.

Section 4324 denounces as gambling all purchases and sales "without any intention of receiving and paying for the property so bought, or of delivering the property so sold." The judgment of the district court appears to be based upon the conclusion that the transactions between plaintiff and defendants violated that section. But the contracts here involved were executed outside Missouri and, as shown by the opinion of this Court, are not governed by § 4324. It is not involved. *Edwards Brokerage Co.* v. *Stevenson*, 160 Mo. 516, 527–528; 61 S. W. 617. *Atwater* v. *Edwards Brokerage Co.*, 147 Mo. App. 436, 448; 126 S. W. 823. *Hood Co.* v. *McCune*, 235 S. W. 158.

---

[6] Compare, also, *Sligh* v. *Kirkwood*, 237 U. S. 52, 62; *Asbell* v. *Kansas*, 209 U. S. 251, 257; *Crossman* v. *Lurman,* 192 U. S. 189, 199; *Reid* v. *Colorado*, 187 U. S. 137, 149; *Missouri, Kansas & Texas Ry. Co.* v. *Haber*, 169 U. S. 613; 623; *Sherlock* v. *Alling*, 93 U. S. 99.

*Claiborne Commission Co.* v. *Stirlen*, 262 S. W. 387, 388,. Cf. *State* v. *Gritzner*, 134 Mo. 512, 526–527; 36 S. W. 39. *State* v. *Christopher*, 318 Mo. 225, 237; 2 S. W. (2d) 621.

The evidence shows affirmatively and without contradiction that plaintiff and defendants did not intend to and did not violate § 4318.

Plaintiff is not a bucket shop proprietor. It has been engaged for many years in operating grain elevators including a terminal one of great capacity and in dealing on its own account in cash grain. It long has been a member of the Chicago, Minneapolis, Kansas City and Winnipeg exchanges and a broker executing customers' orders for the purchase and sale of grain for future as well as for immediate delivery.

In 1924, from April to late November, it had a branch at Carrollton, Missouri, in charge of one McDonough. This branch was connected by private telegraph wire with its Kansas City office and regularly posted prices at which purchases and sales of grain were being contemporaneously made on the exchanges. McDonough solicited from defendants and others in and about Carrollton orders for the purchase and sale of grain for future delivery to be executed by plaintiff upon the exchanges and, upon information obtained from plaintiff, gave advice to those desiring to speculate in contracts for the buying and selling of grain on the exchanges.

He had no authority to bind plaintiff to execute orders and transmitted any obtained by him to the Kansas City office. If plaintiff rejected the order, it notified him at once. An accepted order was sent to plaintiff's office in Chicago and, if for purchase or sale in that city, was executed by its representative in the grain pit on the exchange there. An order for execution at Winnipeg was sent by wire to plaintiff's broker there. Each order forwarded was identified by the customer's name which for brevity in transmission was usually indicated by the num-

ber given to his account. Unless the customer stipulated otherwise, it had to be executed on the day it was given.

In making the purchases and sales on the exchanges, members dealt with each other as principals, but each was required separately to execute each order and, when called on, to furnish the name of his customer to the broker with whom he dealt. The rules of such exchanges required a member to furnish to his customer desiring the information the name of the other broker. And plaintiff made available to defendants' counsel its records disclosing the names of the other parties to the purchases and sales in question.

Upon the execution of an order, plaintiff promptly wired McDonough the result and on the same day sent by mail directly to the customer a confirmation showing the kind and quantity of grain, the time specified for delivery, and the price at which it was bought or sold. Each confirmation contained the statement that " all transactions made by us for your account contemplate the actual receipt and delivery of the property and payment therefor." The customer was bound within the specified future month to receive or deliver the grain he had contracted to buy or sell unless prior to that time he had sold or otherwise closed his contract.

All the contracts here involved were, when made, intended by the parties to be and in fact were closed by such counter transactions prior to the time fixed for delivery. In accordance with usage prevailing on all contract market exchanges, defendants' contracts of purchase were closed by corresponding sales and vice versa. And in each instance plaintiff sent a statement to the defendant showing the respective dates of purchase and sale, the quantity and kind of grain, the specified time for delivery, the amounts of plaintiff's commission and of federal taxes, together with the net gain or loss.

Defendants admit that they intended the orders to be executed on the exchanges, that they were so executed,

and that the accounts are correct. The advances sued on were made and the commissions claimed were earned. Plaintiff did not sell what defendants bought, or buy what they sold. It did not gain when they sustained losses on their contracts to purchase or sell or lose when they made gains thereon. There was no betting between plaintiff and defendants.

The trial judge, taking plaintiff's requests for findings as a basis, characterized the transactions as " purported," " pretended " and " fictitious." It quite clearly appears, from the form and language as well as from the substance of the findings [1] and from his filed opinion, that he held

---

[1] The findings followed the form of plaintiff's requests and employed the same language, except as indicated below. The words italicized were added by the court; those within brackets were deleted from plaintiff's requests.

1. In all of the transactions involved in these suits the plaintiff *purported to act* [acted] as broker for defendants in the purchase and sale of grain for future delivery, and in no case did plaintiff *pretend to* enter into any other than a brokerage contract with any defendant.

2. Every *pretended* purchase and *pretended* sale was executed by plaintiff for defendant on the Grain Exchange in Chicago, Illinois, Minneapolis, Minnesota, or Winnipeg, Manitoba. None of the contracts of purchase or sale involved in these suits *purported to have been* [was] executed in Missouri.

3. Every transaction was a *pretended* contract of purchase or sale of grain for future delivery, *purported to have been* executed on grain exchanges by plaintiff in behalf of defendants on the one side, in which the plaintiff was a clearing member of the exchange where executed and in which the *purported* other party to the transaction, either acting for himself or a *pretended* undisclosed principal, was also a clearing member.

4. Every *pretended* contract of purchase or sale executed by plaintiff for defendants was *purported to have been* carried out in conformity with and in compliance with the rules of the particular grain exchange on which it was *pretended to have been* closed.

5. Every contract *purported to have been* executed by plaintiff on behalf of defendants *pretended to call* [actually called] for the purchase or sale of grain for future delivery and was evidenced by a memorandum in writing under which, and under the customs and

that, as actual deliveries were not intended or made, the contracts creating the right to make or call for delivery on specified terms violated § 4324. The characterizations,

rules of the exchanges were executed, the parties were obligated *in form and pretense* to take or make delivery, or to respond in damages for failure to do so. That, under the custom and practice existing and under the rules of the exchanges, off-setting or ringing purchases or sales *under proper circumstances, in good faith,* were permitted in lieu of the actual delivery of grain contracted for.

6. Every transaction involved in these suits initiated by a *purported* purchase or sale was offset by a *pretended* sale or *pretended* purchase executed in the same manner as the initiating *purported* purchase or sale. Every *pretended* purchase or sale was closed out by a *purported* offsetting transaction before the delivery time arrived and was *purported to have been* executed by plaintiff on the orders and at the instruction of defendants, save and except as to some of the last transactions, which were closed out by plaintiff without instruction from such defendant at a time when defendant had no cash margin to protect his transactions.

7. At all the times in question plaintiff was a member in good standing of the grain exchanges on which the *pretended* contracts of purchase and sale were executed, and plaintiff constantly maintained a margin with the Clearing House of each Grain Exchange as security for the performance of its *bona fide* contracts. All transactions of *pretended* purchase and *pretended* sale executed by plaintiff for defendants were *purported to have been* contracted for on the Exchanges in the name of plaintiff [plaintiff was responsible for their performance, and in each instance where the sale price was for an amount less than the purchase price, plaintiff acting as defendants' broker paid the difference to the Clearing House of the Exchange upon which the transactions were carried out. In none of the transactions did plaintiff profit or lose by a loss or profit to defendants. In all of them it acted only as a broker for defendants.]

8. None of the *pretended* purchases or sales were *purported to have been* executed at Carrollton, Missouri. Orders were *pretended to have been* given by defendants from time to time at Carrollton to plaintiff's local office for *purported* execution on the Grain Exchanges at Chicago, Minneapolis and Winnipeg; but none of these orders were *purported to have been* accepted by plaintiff at Carrollton. All of them were telegraphed to Kansas City for acceptance or rejection, and if accepted, were *purported to have been* carried out by plaintiff

like the statement in the opinion that the transactions were " wagering contracts . . . cloaked with the forms of law," may not be deemed to be findings of fact. They are

by telegraphic instructions emanating from Kansas City and by *pretended* written confirmation of the execution of the order, which *pretended* written confirmations would be mailed from Kansas City to the customer.

9. That no records of the accounts of plaintiff with the defendants were kept at Carrollton; that no moneys were paid out to customers in Carrollton, but remittances were mailed direct by check from Kansas City. All statements, all *pretended* " P. & S's," all *pretended* confirmations of the *purported* execution of purchases and sales, were mailed to defendants from Kansas City. The Carrollton office merely *pretended to* receive[d] and transmit[ted] *purported* orders to its customers to Kansas City for *pretended* execution on the Grain Exchange designated in the customer's *pretended* order.

10. *All* [none] of the transactions of purchase and sale executed by plaintiff for defendants were fictitious transactions. *None* [all] of them were actually executed between clearing members of the Exchange where *pretended to have been* consummated. [one of whom would be plaintiff acting for defendant]

11. In *all* [none] of the transactions [did] plaintiff bet with its customers *and took* [or take] the other side of the deal.

[In no transaction did plaintiff and defendant settle the gain or loss of defendant other than by ascertaining the actual difference between the price at which the commodity was bought and that at which it was sold. In no transaction of purchase or sale did plaintiff and defendant fix a fictitious profit or loss to defendant by an ascertainment of the difference between the contract price and the market price on the day fixed for delivery.]

12. In each transaction, after a *pretended* order to sell or purchase was *purported to have been* executed by plaintiff in behalf of defendant, written confirmation thereof was immediately mailed by plaintiff to defendant. Every written confirmation recited that—

"All transactions made by us for your account contemplate the actual receipt and delivery of the property and payment therefor."

The court's findings did not cover other matters included in plaintiff's requests: the scope of its local agent's authority, whether the orders were made and recorded in accordance with the rules and regulations of the contract markets in which they were executed, and the intent of the parties as to receipt and delivery of wheat bought.

mere assertions in the nature of conclusions of law. The effect or weight to be given them necessarily depends upon the details and circumstances shown by the evidence. Made as they were through a mistaken view of the applicable law, these declarations may not reasonably be adopted here as findings that no such contracts were made and that plaintiff and defendants indulged in the make-believe denounced by § 4318.

There is no evidence of any violation of the bucketshop laws, nor is there any suggestion that the transactions shown can be held illegal except by force of the Missouri statute. I do not disagree with the majority that the Federal Grain Futures Act has not superseded the statutes of Missouri applicable to these transactions.

I am of opinion that the judgment of the district court should stand reversed and that the judgment of the circuit court of appeals should be affirmed.

Mr. Justice Stone and Mr. Justice Cardozo join in this dissent.