## SMITH v. GLADNEY.

### No. 12854.

Court of Civil Appeals of Texas. Fort Worth.

Feb. 24, 1934.

Rehearing Denied March 23, 1934.

DUNKLIN, Chief Justice.

This appeal by Bert K. Smith, defendant in the court below, is from a judgment rendered against him in favor of S. W. Gladney on an instructed verdict for an award in writing made to the plaintiff by a board of arbitrators, to whom the controversy between the parties had been submitted.

The controversy which was determined by the board of arbitrators grew out of the following transactions: On May 2, 1929, the plaintiff purchased from the defendant 10 bids on Chicago July wheat at $1.05, good until the close of the market on July 15, 1929, on a basis of 10,000 bushels. Thereafter the defendant, at plaintiff's instance, gave authority to J. E. Bennett & Co., a member of the Chicago Board of Trade, to allow plaintiff to trade in defendant's name on the Chicago Board of Trade in lots on a basis of 10,-000 bushels until the close of the market on July 15, 1929. In accordance with the authority thus given, J. E. Bennett & Co. made several trades in defendant Smith's name for the benefit of plaintiff, Gladney; the first trade being made on May 25, 1929, and the last one on June 24, 1929. The last trade consisted of a contract of purchase by Gladney of 10,000 bushels of wheat at $1.10½ per bushel for July delivery, for which he could have realized $1.37¾ per bushel on July 15, 1929, which would have been a profit to him of $2,725, but which he lost by reason of the fact that defendant, Smith, placed with J. E. Bennett & Co., on June 27, 1929, a stop loss order to sell said contract, which was done. At the time said stop loss order was given, plaintiff Gladney's profits on prior trades made through J. E. Bennett & Co. had accumulated and amounted to $524.72, which sum was sufficient to have margined and kept alive until July 15, 1929, the contract of purchase above referred to at $1.10½ per bushel.

Both Gladney and Smith were members of the Fort Worth Grain & Cotton Exchange, a society organized for the promotion of the business of the grain and cotton traders and dealers in Fort Worth. It was a private corporation, and by its by-laws a board of arbitration is established for the settlement of disagreements between members in their dealings with each other within the exchange and by which rules and regulations the members bind themselves to submit to such arbitration, and said by-laws require the expulsion from membership in said society of any member who refuses to submit to and abide

Smith & Smith, of Fort Worth, for appellant.

Cantey, Hanger & McMahon and J. A. Gooch, all of Fort Worth, for appellee.

by such arbitration. Gladney demanded of Smith payment of the profits accruing to him under the transactions above mentioned, which Smith refused. The parties then entered into the following written agreement:

"Sam W. Gladney vs. Bert K. Smith

"Contract and Agreement for Arbitration.

"For the purpose of avoiding litigation and in consideration of saving time and expense and for the further consideration that Sam W. Gladney and Bert K. Smith sign this agreement or a duplicate of this agreement, I or we hereby agree to submit to the Arbitration Committee of the Fort Worth Grain and Cotton Exchange composed of G. E. Cranz, Chairman, W. O. Brackett and Sam W. Gladney; Sam W. Gladney being disqualified, and another man to be appointed in his place, or their successors in office, for their decision, orders and award in writing, the difference between Sam W. Gladney and Bert K. Smith, as hereinafter stated, as follows:

"S. W. Gladney's statement attached against Bert K. Smith for $3,237.50 which he has refused to pay, amount was due 7-15-29 (Gladney's remarks).

"The above mentioned arbitration to be in accordance with the provisions of Article XXX of the Constitution of the Fort Worth Grain and Cotton Exchange as revised, or as same may hereafter be amended.

"The undersigned further agree to abide by, and comply with all decisions, orders and awards of the said Committee in all matters whatsoever pertaining in any way to the said case and bound thereby, and such decisions, orders or awards made in writing by the said Committee shall be final, unless appealed from, as provided for in the above mentioned Constitution or amendments thereto that may be hereafter adopted.

"That all members of the Committee are hereby released from any responsibility for error in judgment, in any respect whatsoever and from any damage or loss suffered by reason of their acts.

"That in case any member of the regularly constituted Committees, for any reason, cannot take part in the hearing of this case, other members of the Association may be appointed in their stead in the manner provided by the said Constitution and their names entered in this agreement. In that event all the terms of this agreement shall be as binding on us as though all the members of the regular Committee had taken part in the hearing of this case. Any award rendered by the Arbitration Committee as above, shall be payable to the Secretary of the said Association in Fort Worth, Texas, within five days from date same is rendered by the said Committee.

"[Signed] S. W. Gladney
"[Signed] Bert K. Smith
" 'Under Protest' "

Under that agreement the dispute was submitted to the board of arbitration of the Fort Worth Grain & Cotton Exchange, which board, after hearing the parties and considering the evidence, found that Smith was indebted to Gladney for loss of profits as above indicated, aggregating $3,249.72, and instructing Smith to pay same. Smith declined to perform the award of the board, and Gladney thereupon filed this suit. The pleadings of Gladney alleged the award of the board as well as the transactions of the parties prior thereto, and appellee's suit was to recover on the award so made by the board of arbitration. After evidence heard, each party moved for an instructed verdict in his favor. Appellee's motion was granted, and judgment was rendered in his favor for substantially the same amount as the award to him by the board of arbitration, less a credit allowed for a prior judgment against appellee.

Appellant makes no contention that the trades made by Gladney were not authorized by his purchase of the 10 bids and the authority given to J. E. Bennett & Co. to allow Gladney to trade in appellant's name; nor does appellant question the amount of profits accrued to Gladney on the trades made, as found by the board of arbitration.

The main defense made in the trial court and stressed here is that Smith's sale of the 10 bids to Gladney and his later agreement to allow Gladney to trade in his name were gambling transactions, forbidden by the penal statutes of this state and by public policy, and therefore void and unenforceable for lack of lawful consideration, and that Smith's subsequent agreement for arbitration of the controversy is likewise unenforceable for lack of lawful consideration, because tainted with the same vice as were his two former contracts.

Testimony was introduced sufficient to support a finding sustaining the allegations in Smith's pleadings, to the effect that it was understood and intended by himself and Gladney, at the time of the sale of the 10 bids, that by that transaction Gladney should have the right to speculate on the market on margins only, and that it was not contemplated or intended that there should be an

actual delivery of any of the wheat which Gladney might buy or sell.

It thus appears that the conclusion reached by the trial court was that, even though it could be said that the original transaction between the parties, in which Smith sold to Gladney the 10 bids, was a gambling transaction, that fact would not be a defense to Gladney's action to recover on the award made by the arbitrators; and in our opinion the court did not err in that conclusion.

Article 658, Rev. Criminal Statutes (Pen. Code), reads as follows: "Any contract of sale for future delivery of cotton, grain, stocks, or other commodities where it is not the bona fide intention of parties that the things mentioned therein are to be delivered but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, without any actual bona fide execution and the carrying out of such contract upon the floor of such exchange, board of trade or similar institution, in accordance with the rules thereof, shall be null and void and unenforceable in any court of this State, and no action shall be maintainable thereon at the suit of any party."

By article 661, Rev. Crim. Statutes (Pen. Code), it is made a felony for any person, either as agent or principal, to enter into any contract of sale made in violation of article 658.

■ The trades for Gladney's benefit and out of which profits were realized were made on the Chicago Board of Trade, where Smith authorized Gladney to trade; and therefore parties engaged therein could not have been prosecuted in this state under our penal statutes. The sale of the 10 bids, followed by Smith's agreement to allow Gladney to trade on the Chicago Board of Trade, was separate and distinct from the transactions under and by virtue of such authority, and was not a violation of the Penal Code of this state. Nor was there any contention by appellant that the trades made by Gladney on the floor of the Chicago Board of Trade were in violation of any penal statute of the state of Illinois.

■ The Grain Futures Act of Congress (7 USCA §§ 1–17) prescribes certain regulations for dealing in futures in interstate commerce and condemns as unlawful certain designated kinds of trading on margins; but in subdivision (b) of 7 USCA § 6 there is excepted from those regulations contracts made through a member of a board of trade which has been designated by the Secretary of Agriculture as a "Contract Market," if such member complies with certain requirements therein designated, such as keeping a record of the contracts, notifying the parties thereto, etc. The record evidences that the Chicago Board of Trade was designated as a "Contract Market" by the Secretary of Agriculture, and that J. E. Bennett & Co. complied with the requirements specified in the section of the act just mentioned. But we overrule the contention of appellee that by reason thereof the contracts made by Bennett & Co. on the Board of Trade in Chicago were validated by that act. As said by the Supreme Court in Dickson v. Uhlmann Grain Co., 288 U. S. 188–206, 53 S. Ct. 362, 366, 77 L. Ed. 691: "The federal act declares that contracts for the future delivery of grain shall be unlawful unless the prescribed conditions are complied with. It does not provide that if these conditions have been complied with the contracts, or the transactions out of which they arose, shall be valid. It does not purport to validate any dealings. Nor is there any basis for the contention that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded."

■ However, a rule of the common law, which has been enforced by many decisions of appellate courts of this state, is that, if an original contract is illegal, any subsequent contract in aid thereof, made for the purpose of carrying into effect the original contract, is voidable and unenforceable in the courts. But it is also a rule that a contract which is incidentally connected with or grows out of an illegal transaction does not necessarily invalidate it. If such a contract is founded on a new or different consideration, it is enforceable, provided the party seeking relief can show a complete cause of action without being compelled to rely upon the original illegal contract. And an agreement of settlement by the parties to an illegal contract, after it has been executed, may be enforced, if this can be done without the aid or assistance of any part of the illegal transaction. 10 Tex. Jur. pp. 248–257. Section 145, p. 254, of the same volume reads in part as follows: "The test for determining whether a demand connected with an illegal act can be enforced is whether the person seeking to enforce it requires any aid from the illegal transaction to establish his case. No recovery can be had if it is necessary for the plaintiff to prove, as part of his cause of action, his own illegal contract or other illegal transaction. But the plaintiff may re-

cover if he can show a complete cause of action without being obliged to prove his own illegal act, although such act may incidentally appear, and may be explanatory even of other facts in the case, it being sufficient if his cause of action is not essentially founded upon something which is illegal."

The following is quoted from 2 Ruling Case Law, p. 386, § 32: "The award of arbitrators, acting within the scope of their authority, determines the rights of the parties as effectually as a judgment secured by regular legal procedure, and is as binding as a judgment, until it is regularly set aside or its validity questioned in a proper manner. Their decision on matters of fact and law is conclusive, and all matters in the award are thenceforth res judicata, on the theory that the matter has been adjudged by a tribunal which the parties have agreed to make final, a tribunal of last resort for that controversy. And this has been held true even in a case in which one of the parties neglected to present portions of his claim. He had his chance, and, after the award, was concluded thereby, and could secure no relief. A valid award bars future suits over matters therein decided, and if a suit is brought, the award may be introduced in evidence, and is conclusive as to matters contained therein."

Appellant has cited decisions from other states in which it was held that an award by arbitrators under an agreement between parties to a controversy is not enforceable if it is founded upon an illegal transaction, since such an illegal transaction is not a proper subject for arbitration. Those decisions are cited in 2 Ruling Case Law, § 34, p. 389, § 8, p. 358; 5 Corpus Juris, § 39, p. 31.

But it seems to be the well-settled rule of decisions of this state that, if plaintiff's case can be made out without resort to a former contract which is unenforceable because in violation of law, relief may be granted without any distinction between the obligations arising under an arbitration award and those under any other new contract.

De Leon v. Trevino, 49 Tex. 88, 30 Am. Rep. 101, was a suit by Trevino on four promissory notes given by De Leon on a settlement and liquidation of a business enterprise entered into by and between the parties to the notes contrary to public policy and in violation of the laws of the United States. In the opinion of our Supreme Court, the following was said: "This action is not founded upon the alleged illegal contract, nor was it brought to enforce any of its stipulations or conditions. The illegal enterprise, if it was illegal, in which De Leon and appellees were engaged, and all the matters connected with it, were voluntarily settled and adjusted by them. True, the notes upon which the suit is brought were given by De Leon in such settlement. But if a contract is illegal, certainly it does not follow that it is illegal or immoral for the parties, after its completion, to fairly settle and adjust the profits and losses which have resulted from it. The vice in the contract does not enter into the settlement so that all contracts and undertakings based upon, or growing out of, the settlement, confer no rights which the courts will respect or enforce. By her answer, appellant sought to be relieved against an executed contract, upon the ground that her intestate had been engaged with appellees in an illegal enterprise. But she is not entitled to relief upon such ground. If the notes sued upon had been given to carry on the illegal enterprise, instead of in settlement of it, the taint of the contract would have attached to the notes, and appellees could not maintain an action upon them. But the answer merely shows, that, by reason of the illegal character of the enterprise in which the parties had been engaged, appellant's intestate could not have been forced to an accounting with appellees, or to pay or give his notes for the amount found to be due from him to appellees on such accounting. This, however, is no reason why an action may not be maintained on notes given for the amount found to be due on a voluntary settlement of the illegal partnership enterprise. And it has often been, in effect, so held in this as well as other courts."

We quote the following from the syllabus of Pfeuffer v. Maltby, 54 Tex. 454, 38 Am. Rep. 631: "Although a contract of partnership may be illegal, it does not follow that it is illegal or immoral for the parties to it, to fairly adjust the profits and losses that have resulted from it."

Hall v. Edwards (Tex. Com. App.) 222 S. W. 167, 168, was a suit by Hall against Lula Edwards to recover title to a house and lot situated in the city of Wichita Falls. Pennington and Hill sold the property in controversy to Everett Hughes, retaining in the deed a vendor's lien to secure 56 purchase money notes, which notes were also secured by a deed of trust on the property. On the same day, Hughes conveyed the property to Lula Edwards, who assumed the payment

of the notes. Default having been made in the payment of the notes, the trustee named in the deed of trust sold the property to Hall. We quote the following from the opinion by Justice Sonfield, Presiding Justice of the Commission of Appeals:

"The cause was submitted to a jury upon special issues. In response to such issues, the jury found that Pennington and Hill sold the property to be used for immoral purposes; that it was used for immoral purposes; that at the time plaintiff in error purchased the property under the trustee's sale he knew that the property had been sold by Pennington and Hill for immoral purposes, and was then being used for such purposes.

"The Court of Civil Appeals [194 S. W. 674] finds further that Pennington and Hill built the house to be used for prostitution and for sale to those engaged in that business; the terms of sale being so arranged that payments might be made out of the profits of the business conducted on the premises. The evidence establishes that the property was deeded to Hughes with the understanding that it be conveyed by him to defendant in error; the object being to circumvent any adverse action arising out of the immoral and illegal contract. There is evidence that in purchasing the property at the trustee's sale plaintiff in error acted for and in behalf of Pennington and Hill, and that the purchase by him was for the use of Pennington and Hill. * * *

"It is apparent that Hughes was a mere conduit through whom, by agreement of the parties, the title was to pass to defendant in error.

"The authorities are agreed that a court will not lend its aid, in any manner, toward carrying out the terms of an illegal contract, and, when a plaintiff cannot establish his cause of action without relying upon such contract, he cannot recover. Read v. Smith, 60 Tex. 379; Beer v. Landman, 88 Tex. 450, 31 S. W. 805; Wiggins v. Bisso, 92 Tex. 219, 47 S. W. 637, 71 Am. St. Rep. 837.

"As stated in Frost v. Plumb, 40 Conn. 111, 16 Am. Rep. 18, quoted in Beer v. Landman, supra:

" 'We understand the rule to be this: The plaintiff cannot recover whenever it is necessary for him to prove, as a part of his cause of action, his own illegal contract, or other illegal transaction; but if he can show a complete cause of action without being obliged to prove his own illegal act, although such illegal act may incidentally appear, and may be important even as explanatory of other facts in the case, he may recover. It is sufficient if his cause of action is not essentially founded upon something which is illegal. If it is, whatever may be the form of the action, he cannot recover.'

"Illegal contracts of this character are said to be void. The use of the term 'void' in this connection tends to confusion. Such contracts are void in the sense that they are incapable of enforcement in courts of justice, and will not support a remedy. No legal obligation is incurred by either party. But such contracts are not void in the sense that they can confer no rights. They can be executed by the voluntary acts of the parties, or through some means or agency, other than the courts, agreed upon between the parties; and if, and when, so executed, they may confer actual and irrevocable rights upon the parties. 2 Elliott, Con. § 1061; McBlair v. Gibbes, 17 How. 232, 15 L. Ed. 132.

"From the fact alone that a contract is unenforceable in the courts, it does not follow that an enforceable right or estate cannot result therefrom. * * *

"Plaintiff in error not seeking the enforcement of the contract, and not invoking it to sustain a remedy, its illegality is no defense. To permit this defense, under the facts herein, would be to create a right or title in defendant in error dependent entirely upon such contract. It would, in effect, be to enforce the contract on her behalf, enabling her to reap a benefit thereunder. The same principles which govern courts in declining to enforce an illegal contract in aid of a plaintiff's title inhibit its use to create a title in a defendant. Wooden v. Shotwell, 24 N. J. Law, 789. * * *

"Despite the illegality of the transaction, there was a moral obligation resting upon defendant in error to pay the purchase-money notes or reconvey the land. While courts will not enforce the moral obligation, they will recognize it as a valuable and sufficient consideration to support the deed. Bicocchi v. Casey-Swasey Co., 91 Tex. 259, 42 S. W. 963, 66 Am. St. Rep. 875; McBlair v. Gibbes, supra. * * *

"Though the execution of the deed in trust was illegal, the sale thereunder had in it no element of illegality. It was not in contravention of public morals, nor contrary to any public policy, and the title vesting in plaintiff in error was complete without reference to the original illegal contract."

■ Appellant pleaded that he was coerced into such arbitration by knowledge of the fact that he would lose his membership and right

to appear upon the floor of the halls of the Board of Trade if he did not submit to such arbitration, and that such membership and access was vital to the successful conduct of his business. There are two answers to that contention. In the first place, such was not coercion. Any voluntary private society has the right to make its own rules not in contravention of the law of the government and upon whatever terms it desires, however arbitrary. No one is compelled to obey such rules, and he may not claim the benefits of such membership and deny its obligations against the wishes of the society. In the second place, there is no showing in the record that appellant ever expressed such feelings of coercion until after the arbitration board, upon his voluntary submission to it, had decided against him. Standard Chemical & Oil Co. v. Sloan Co. (C. C. A.) 268 F. 225.

 It cannot be said that appellant's written contract to abide by the decisions of the arbitration board was without sufficient consideration to support it, since it is the policy of law to encourage settlements by arbitration, and Gladney's agreement to be likewise bound was, of itself, sufficient consideration for appellant's agreement.

██ Since plaintiff's suit was to recover on the award of the arbitrators and defendant's contract to pay him the amount so awarded, it was not necessary for him to rely in whole or in part on defendant's sale of the 10 bids, already mentioned. Hence, the defense, based on the illegality in the award, noted above, was untenable.

For the reasons stated, the trial court did not err in instructing a verdict in plaintiff's favor, and the judgment is affirmed.

LATTIMORE, J., not sitting.